# LAURA A. SITES v. STUART R. KNOTT and EDWARD F. SWINNEY, Receivers of KANSAS CITY SUBURBAN BELT RAILROAD COMPANY, Appellants.

**In Banc, June 20, 1906.**

1. **NEGLIGENCE: Contributory: Humanitarian Doctrine.** The humanitarian doctrine proceeds upon the theory that the injured party was in the first instance guilty of some negligence in placing himself in a position of peril, but that such negligence does not prevent a recovery if the servants of defendant operating the engine or cars could have seen him in such position of peril in time to have avoided the injury by the exercise of ordinary care, and failed to do so.

2. ———: ———: ———: **Presumption.** Where the injured party, before attempting to cross a series of switches at a recognized crossing, could have seen the engine as easily as the engineer could have seen him, but nevertheless put himself in peril by attempting to cross through an opening between cars, and they were propelled by the engine against him, there is no room for an instruction embodying the humanitarian doctrine in the case, for the law, in such case, allows the engineer to presume that the injured party, seeing the engine and knowing the peril, would not attempt to cross between the cars.

3. ———: **Recognized Crossing: Implied Invitation: Signals.** Plaintiff's husband was killed in attempting to pass through a narrow opening between freight cars standing on a track of the switch yard, and charges the defendant with negligence in causing the cars to suddenly come together without ringing the bell, sounding the whistle or giving any other warning. The place was not a public street. *Held,* that, if people for any considerable time had been accustomed to cross the tracks at the point where deceased was killed, and defendant recognized their right to do so, and in  recognition of this right and custom was in the habit of leaving openings between the cars for the public to pass through, then defendant owed .it to the public. and to deceased to give them  a reasonable warning of its intention to close the opening, and its failure to do so constitutes negligence; on the contrary, if defendant did not recognize the right of the public to cross the tracks at the .place where deceased was killed, and did not by its conduct indicate a recognition of such right, and the openings between the cars were mere chance or accidental openings, then

persons who passed through them were not warranted in treating them as implied invitations to use them for a crossing, and defendant was not required to give signal warnings of the closing of them.

Appeal from Jackson Circuit Court.—*Hon. James Gibson*, Judge.

REVERSED AND REMANDED.

*Samuel W. Moore* and *Cyrus Crane* for appellants.

(1) The demurrer should have been sustained. (a) Because, under the undisputed facts, there was no negligence on defendant's part and no right of recovery. Stillson v. Railroad, 67 Mo. 676; Gurley v. Railroad, 104 Mo. 212, 122 Mo. 141; Schmitz v. Railroad, 119 Mo. 256, 46 Mo. App. 380; Wilkinson v. Railroad, 101 Mo. 63. (b) Because the deceased was guilty of gross negligence, causing his injury, and there was neither allegation nor proof of recklessness, wilfullness or wantonness on defendant's part. 1. Negligence of the act of deceased: Gurley v. Railroad, 104 Mo. 211; Stillson v. Railroad, 67 Mo. 676; Schmitz v. Railroad, 119 Mo. 256; Hudson v. Railroad, 101 Mo. 13; Corcoran v. Railroad, 105 Mo. 399; Bean v. Liability Co., 50 Mo. App. 459; Thompson v. Railroad, 93 Mo. App. 549; Bird v. Railroad, 48 N. W. 691; Howard v. Railroad, 21 Pac. 267. 2. No recklessness, wilfullness or wantonness on the part of defendant's employees: Nelson v. Railroad, 68 Mo. 593; Yarnall v. Railroad, 75 Mo. 575; Powell v. Railroad, 76 Mo. 81; Dlauhi v. Railroad, 105 Mo. 645; Maxey v. Railroad, 113 Mo. 1; Loring v. Railroad, 128 Mo. 349; Vogg v. Railroad, 138 Mo. 172; Tanner v. Railroad, 161 Mo. 497; Sharp v. Railroad, 161 Mo. 214; Zumault v. Railroad, 175 Mo. 290; Davies v. Railroad, 159 Mo. 9; Hayden v. Railroad, 124 Mo. 566; Kelsay v. Railroad, 129 Mo. 362; Lane v. Railroad, 132 Mo. 1. (c) Because the case alleged in the peti-

tion was not proven. 1. There was no proof of the specific negligence charged in the petition. Gurley v. Railroad, 93 Mo. 445; Bartley v. Railroad, 148 Mo. 139; McManamee v. Railroad, 145 Mo. 440; Hite v. Railroad, 130 Mo. 132. 2. There was no testimony that no warning was given. Gurley v. Railroad, 93 Mo. 445, 104 Mo. 211. 3. In the absence of evidence to the contrary, the presumption is that the trainmen did their duty. 21 Am. and Eng. Ency. Law, 510; Saunders v. Co., 147 Mo. 428; Jewett v. Railroad, 50 Mo. App. 547. 4. There was no testimony that the cars were separated so as to allow foot passengers to pass between them. Such proof was essential to plaintiff's recovery. Gurley v. Railroad, 104 Mo. 211. 5. There was no testimony that other persons were passing through this opening with the knowledge of defendants. 6. There was not a word of testimony that defendant's employees saw or "could have seen, deceased in a place of danger." (2) The court erred in the instruction given on plaintiff's behalf. There was no evidence that deceased was or could have been seen in a position of peril in time to have averted the injury. Moody v. Railroad, 68 Mo. 470; Frick v. Railroad, 75 Mo. 608; Malloy v. Railroad, 84 Mo. 270; Boyd v. Railroad, 105 Mo. 371; Holden v. Railroad, 177 Mo. 456; Guyer v. Railroad, 174 Mo. 349; Van Bach v. Railroad, 171 Mo. 347; Thompson v. Railroad, 93 Mo. App. 554; Reno v. Railroad, 79 S. W. 464; Davies v. Railroad, 159 Mo. 1; McGauley v. Railroad, 79 S. W. 461; Evans v. Railroad, 178 Mo. 517; Roenfeldt v. Railroad, 79 S. W. 706.

*A. N. Adams* and *Scarritt, Griffith & Jones* for respondent.

(1) The theory of plaintiff's petition and of the single instruction which was asked on her behalf is abundantly supported by the testimony. This is sufficient to sustain the verdict. (2) The place where

plaintiff's husband was killed had been used as a quasi-public crossing for twenty-one years. (3) It is shown by the testimony that the company further recognized the place where plaintiff's husband was killed as a crossing, by generally leaving an opening between its cars at that point. (4) The crossing upon which plaintiff's husband was killed was the only crossing between Gillis street and Lydia avenue, a distance of over a quarter of a mile. (5) That the collision was caused by the switch engine·and that no warning was given of its approach, is not left in doubt by the testimony. (6) The testimony overwhelmingly establishes the negligence of defendants, and brings the case clearly within the principles of law laid down by this court, applicable to the circumstances of this case. Easley v. Railroad, 113 Mo. 243; LeMay v. Railroad, 105 Mo. 370; Fiedler v. Railroad, 107 Mo. 651; Schmitz v. Railroad, 119 Mo. 272; Brown v. Railroad, 50 Mo. 467; Hanlon v. Railroad, 104 Mo. 390; Hicks v. Railroad, 64 Mo. 439; Frick v. Railroad, 75 Mo. 609; Holden v. Railroad, 177 Mo. 472. (7) There was sufficient evidence to submit to the jury the question as to whether defendants' agents in charge of the switch engine could, by the exercise of ordinary care, have seen plaintiff's husband on the crossing and attempting to go over the tracks, and avoided the injury by checking the speed of the engine. Thompson v. Railroad, 93 Mo. App. 553; Hanlon v. Railroad, 104 Mo. 381; Klockenbrink v. Railroad, 72 S. W. 902; Bunyan v. Railroad, 127 Mo. 13. (8) Plaintiff's husband was not guilty of contributory negligence as a matter of law under the facts and circumstances of this case. Jennings v. Railroad, 112 Mo. 275; Nichols, Admr., v. Railroad (Va.), 5 S. E. 171.

FOX, J.—This cause is here upon appeal by the defendants from a judgment of the circuit court of Jackson county, Missouri. This is an action brought by the widow of William R. Sites to recover the statu-

tory penalty on account of the death of her husband, who was killed on September 6, 1901, at about 4 o'clock in the afternoon, by being crushed between the drawheads of two freight cars in the yards of the Chicago & Alton railroad company, located in what is called East Bottoms in Kansas City, Missouri. Deceased was a mail carrier and had been on the same route for two months prior to his death, crossing at or near the point where he met his death, three times a day. That portion of the Alton yards in question lies between Gillis street on the west and Lydia avenue on the east, a distance of a little over a quarter of a mile. Throughout this distance the yards are not intersected by cross-streets on account of the high bluff ranging from 20 to 50 feet in height on the south, which begins just west of the gas works at Gillis street and extends east nearly to Lydia avenue. Between this bluff and the south side of the tracks are four small houses; the one farthest west belongs to Mrs. Rodes; just across the tracks to the north is the Zenith mills; between the Rodes house and this mill is the point of the accident. East of this mill lies the property of the Bolen . Coal Company. Within this space and north of the tracks there are also some other business houses, offices and the residences of three or four other families. Between 10 and 150 feet east of the Rodes cottage, in the gulch or draw in the bluff, is located a spring, which is frequently used by people in the neighborhood. At the point of the accident, between the Rodes cottage and the Zenith mills, the Alton's tracks are arranged as follows, beginning on the south: First, the "mud track" (used for storing cars); second, the Kansas City Suburban Belt receiving track. These two tracks are connected by a switch at the west end of the Rodes cottage. Third and fourth, Alton main tracks (kept free to permit passage of trains). Fifth, the Kansas City Suburban Belt delivering tracks. Sixth, Zenith mill track. (Tracks five and six are connected at the point marked "X" on

the plat). The location of these tracks is fully shown on the plat. The west end of these yards in question near Gillis street is the connection of the Chicago & Alton and the Suburban Belt — that is, the point where deliveries of cars are made to and from one road to the other. The Alton sets all cars which it has destined for the Belt on track 2, and the Belt Company places its cars for the Alton on track 5. Each road gets the cars thus set to it at certain intervals, suiting its own time and convenience.

The negligence complained of in this action is embraced in the following part of the petition filed by the plaintiff, which is as follows:

"That defendants are and at all times herein referred to are and have been engaged in the business of running, conducting, managing and operating all of the railroad property, locomotives, cars, trains, and rolling stock of the said railroad heretofore and now commonly known as the railroad of The Kansas City Suburban Belt Railroad Company, and that part of the said business of the defendants is and was during all of said period to transfer cars of various railroad companies from one track to another and from one locality to another in Kansas City, Missouri, on tracks owned or controlled by them, or other persons or corporations, and on and from those certain railroad tracks extending in an easterly and westerly direction across Troost avenue south of the Zenith mills, near First street, in said city, which said Troost avenue is a public street in said city, which said place is a populous and thickly-settled locality in the vicinity of which are many dwellings, mills and factories, and that at or near the intersection of the west line of Troost avenue with said tracks, a great number of people are and were at the time herein referred to and for a long time prior thereto accustomed to and did daily cross the said tracks, of all of which facts defendants through

197 Sup.—44

their servants and agents in charge of their said railroad, engines and cars, had notice; that at all times herein referred to the said William R. Sites, while engaged in the service of the United States Government in carrying and delivering mail to the residents and persons engaged in business at or near the intersection of said railroad tracks with the west line of Troost avenue in said city, was accustomed to and did as one of the public daily cross the said railroad tracks at and near the west line of the said Troost avenue and where the public were accustomed to and did cross as aforesaid, and on or about the 6th day of September, 1901, he did, while so engaged in his said business and while in the exercise of ordinary care, attempt to cross said tracks at or near the intersection thereof with the west line of Troost avenue, and in so doing did attempt to pass between certain stationary freight cars which were then on one of said tracks but separated so as to allow foot passengers to pass between them; that other persons at the same time and immediately prior to the said attempt of said William R. Sites, with the knowledge of defendants through their servants and agents, had been and were passing between said cars, and the defendants' servants and agents while in charge of and running and managing a certain locomotive engine then being managed and operated by the defendants through their said servants and agents negligently and carelessly ran the said locomotive engine against the said cars standing west of the point at which said William R. Sites attempted to cross said track and drove them suddenly upon the said William R. Sites and caught and crushed him between said cars as he was attempting to cross said track as aforesaid and thereby mangled and injured him, which said injuries thereafter and during the same day caused his death, and without ringing any bell, or blowing any whistle, or giving any warning of the approach of the said cars or locomotive engine, and when they, the said servants and agents

of defendants, whilst running, conducting and managing the said engine and cars, saw said William R. Sites in a place or danger, or when by the exercise of ordinary care, they could have seen him in such place of danger in time, by the exercise of ordinary care to have avoided injuring him. That by reason of the premises, plaintiff has been damaged in the sum of five thousand dollars.''

The answer consists of a general denial and a plea of contributory negligence. There was no testimony introduced on the part of the defendants. The testimony of the various witnesses introduced on behalf of the plaintiff was substantially as follows:

J. P. Smiley, on direct examination, testified as follows: I have charge of the elevator department of the Zenith mills at the foot of Troost avenue and First street and have been working for this company about four years. At the time of this accident I was sitting in the door on the east side of elevator facing east; I did not see the accident; it happened to my right; I went to him right after it happened; he was lying about 30 or 35 feet from where I was sitting; if I had been looking south I could have seen the accident; my attention was called to him by a little girl screaming; I crawled under one car and had to cross one car after I crawled under; crossed one track and saw him lying on the ground after I crawled under the car; he was lying very near opposite the gate to Mrs. Rodes' house, might have been a little bit east of the gate. There was an opening between the cars; I passed through it three times that day, once in the morning about seven o'clock and then in going to and from Mrs. Rodes' at noon. This accident occurred about half past three in the afternoon. There was a solid string of cars from Gillis street to this opening; this opening was about two feet in width; east of this opening was a vacancy of a half or two-thirds of a car's length; then cars standing close together down to the end of the

switch; this was on the receiving track. East of this opening of two feet was an empty car; there was a track south of the receiving track called mud track; the switch stand connecting mud track and receiving track is a little this side of the Rodes house; west of her house the cars cannot be crowded up to the switch stand; there were five tracks there altogether. Sites was injured practically at the connection of the mud track and the receiving track; I tried to get through at this place that morning but there was not room to go through sideways. The cars on mud track had been there at least two weeks; those on the receiving track were pushed in and taken out nearly every day; some days they would not be, but as a rule they took them out once a day; these cars on the receiving track were in the same condition the evening before at six o'clock when I went home as they were at the time of the accident. The Chicago & Alton track next to the mill on the north side, the fifth track, was full of cars from Gillis street to the mill; the cars on mud track extended east from where Sites was injured across Troost avenue or what would be Troost avenue if it was cut through. There is a big bluff there and two paths leading up to it; at the foot of this bluff is a ravine and a spring. The first nine months I worked at this mill I lived up in this part of town and went down the air line tracks, but since that I have lived on Forest avenue and when it isn't real muddy I go down this hollow and home that way, crossing the tracks at what would be Troost avenue, somewhere near where the accident occurred and near the Rodes house. The place where the deceased was injured has been used continuously as a passageway, passing there all day long, men, women and children, morning and evening; I have seen as many as 15 or 20 men just as a line going up that path; this spring is used by the whole neighborhood and the school children. The entrance to this hollow is about 25 or 30 yards east of Mrs. Rodes' house; families on

the north side of the tracks west of the mill and some
due north of the mill, four cottages across the street
from the mill in going for water come to the
west side of the mill and cross between the ele-
vator and the Rodes house, where Sites was in-
jured; coming from the other way they come
around the corner of the mill between the mill and
coal yard and cross the track a little east of where
he was injured. Sites had delivered mail at Mrs. Rodes'
and was making his next route to the mill office. I
have seen people drive teams across at this place, tak-
ing feed over there; they would come in at the east
end of the mill for a load of wheat, get on the scales
and have to drive across the track to Mrs. Rodes' house
to get a vacancy to get out. It was solid track from
the elevator to the Rodes house; there would probably
be room for one more track in front of her door. People
have been crossing and recrossing at this place ever
since I have been there; I would estimate that not less
than 50 people cross there every day; it is used as a
general crossing for all persons in the neighborhood;
it is the only way to get across from between Lydia
to Gillis street. The deceased could not have gotten
across unless he crawled under the cars or went over
the top or without going through this opening, back
to Gillis or down to Lydia. He made this trip over
this route three times a day, crossing at about the
same place each day. I saw him that day; he came
down Gillis street and if he had mail for any one on
the south side of the track would come down next to
the track, between the tracks and the gas house fence;
he nearly always had mail for the Rodes house and
sometimes he would have mail for the next door east,
then he would have to come back west before he could
cross the tracks. The Chicago & Alton road had ties
piled between the track and gas house fence; I have
seen them piled 12 and 14 feet high; four or five piles;
on the day of this accident I would judge the ties

were eight feet high; this fence is about 12 or 14 feet high; there is not room for a man to walk between the fence and ties; he could walk between the rail and the ties; these ties were west of the Rodes house. I did not hear a bell or a whistle prior to the accident; was in a position to hear it if a bell had been rung or a whistle blown. These cars on the receiving track extended to Gillis street. With these obstructions, the fence and ties and the way the cars were that day, a person passing from the gate at the Rodes house to the cars looking west could not have seen this switch engine on the Suburban Belt switch until it ran upon the cars; as it comes on Gillis street it makes a short curve to get on the receiving track; it could not have been seen if there were no ties there.

Upon cross-examination he testified: This track spoken of as the receiving track of the Suburban Belt is the track the Chicago & Alton sets cars onto they intend the Suburban Belt engine to take away; occasionally the Belt Line leave cars there themselves; as a general rule the Belt Line engine would come in once a day and take all cars set on that track; the next day there might be some cars put at the west end toward Gillis, and then a break, and another batch of cars and another break, and another batch; I have seen the Chicago & Alton set them in there a dozen or fifteen at a time all coupled together; they generally push them up to Gillis street as far as they dare and fill them in there off and on all day to fill the track; the engine would come again at different times and fill in one, two, three or four at a time; sometimes they would couple them all up and sometimes they would not; if they had as many as four or five they were already coupled; if they brought in one car they would throw it on the track, right in and up to the train; sometimes they would couple them and sometimes they would not. On this particular day there were a number of cars west toward Gillis street and then a two-foot opening; there

was a boy in this car which stood separated from the
others about two feet, after that car was another space
of two-thirds of a car's length, east of the mud track;
then the cars were pretty near solid down to the end.
I could not state what time the previous day these
cars were set in there; some were there the evening
before. The switch engine did not have a regular hour
to come in there; I have known them to come in at
nine in the morning, at eleven and three, or later in
the evening. The track next to the elevator, which is
the Chicago & Alton receiving track, was filled with
cars from Gillis street to the mill switch, marked ''X''
on the plat, or what would be Troost avenue, which
would be about 150 feet from where I was sitting. In
going to where the deceased was lying I had to crawl
under the cars on the track next to the elevator; if he .
had succeeded in getting across the track and wanted
to go into the mill from the Rodes house he would
either have to crawl under the cars on the elevator
track or have gone east to the point of the switch.
The entrance to the gulch or draw is over 100 feet east
of the Rodes house; there are two paths, one on each
side of the spring branch; people coming down the
gulch to the railroad track, if they want to get to the
mill, cross the track at what would be Troost avenue,
a hundred or so feet east of Mrs. Rodes' house; for
instance coming down the gulch going to the mill, when
I come to this mud track I have got to go west or crawl
under or over the tops of the cars, if there are cars
there; if there are no cars they go diagonally across,
but cannot go straight, have to bear west and north;
walking across the track at that point is all right if there
are no cars there; the tracks along there from the point
east of the east end of the mill down to the west end of
the mill are on practically level ground; people going
up the gulch or going across from the gulch to the north,
so far as walking is concerned, can cross at one point as
well as another if the cars are not there; they cross all

the way from the mouth of the gulch to the west end of the elevator, a distance of something over 100 feet; no regular path or anything of that kind; cross where it is handiest for them; the opening was changed according to the number of cars and the way they were placed; there was no path after you leave the end of mud track except right up the side of the tracks. On this day I do not know how many cars there were west of this opening where Mr. Sites attempted to go through and Gillis street; the switch engine was standing right in Gillis street when we picked him up; not directly in it; had not gotten clear across the street; part of the engine was standing in the street; that was the only engine there. These cars were uncoupled when I reached the place of the accident; there was rust on the rails showing the cars had been moved about eighteen inches or two feet. You could stand north of Mrs. Rodes' house and just south of the Suburban Belt track and look down and see the switch engine after it got off of the switch onto the receiving track.

Mrs. Mary Stanley testified substantially as follows: I live at Third and Forest avenue and have been living there 14 years; on the day that Sites was injured and about five or seven minutes before the accident I passed through this opening in the cars; had to go through sideways; I weigh 208 pounds. I was on the opposite side of the track, going around the cars at the elevator, when Mrs. Rodes' little girl came and told me that the mail man was killed. In crossing the track this little girl was behind me; Mr. Sites was on the track as I was coming; in coming from my home I come straight down one of these paths, down the hill, the way we always come; everybody passes that way; I crossed the track in front of Mrs. Rodes' house; could not cross before I reached that point on account of the cars on mud track; when I found the track was full of cars I kept on going until I found an opening; I have been going to the mill for the last 14 years; I have

crossed it going on 14 years; that is the usual way people go to the mill and back; every working man living in our direction goes that way; as to the people that live north of the track and go to school, I don't know except when I go myself; I don't notice them; the deceased was on the pathway just about opposite the gas house fence coming from Gillis street and going east when I saw him, along the south side of the track, the side the Rodes house is on; I did not see him go to the Rodes house. I always like to pay particular attention to where I am going for fear an engine is coming along, because it is a dangerous place to cross; both engines were on the other tracks when I went through; before I went in I noticed to see if the engine was there; there was no engine on the track at the time; they were on the track the mail man was on; one was on the regular Belt Line track to the best of my opinion, coming down at the head of the crossing; I do not know whether this engine hit the cars or not; all I know is that no engine was there when the mail man came — no engine was attached to the cars, nor at the time he could get to Mrs. Rodes' house, because he came straight on down; he had no other way to come to her house.

On cross-examination she testified: In going to the mill I come down the gulch and cross mud track at the first place I find an opening through the cars. If there is an opening at the foot of the gulch I cross right there diagonally to the mill, in case no engine is in sight of me; I would watch for the engine. I made the remark to the girl that day that I thought I might get hurt, those cars being so close together. Before I went in I said to the little girl, "Birdie, go out and see if you see an engine on the other side," and she said, "No, there is none." I knew it was a dangerous place on account of being a narrow opening; I stood there again and looked up the track by the next car to see if the engine was coming down to catch onto these cars. When I come down the gulch and find cars on mud track I go

until I find a safe opening; sometimes I find that east of the Rodes house and sometimes right at the mouth of the gulch, but very seldom there is any opening over these tracks across there; there are cars there most of the time; there is no regular place where there is an opening through the cars; sometimes one place and sometimes another; I have found one up and down on those tracks; this day I had to go as far west as Mrs. Rodes' house before I found an opening; when I got over to the mill track there was another string of cars and I went around the end of these cars because I saw an engine at the head of them; there was no opening in that string of cars. Just what tracks the two engines were on I don't pretend to tell the court, but I know I could see them; they were in the neighborhood of the gas house; they are switching cars on the tracks there every hour and every minute. There was no engine attached to the cars when I went through this opening; I looked straight up the track and there was nothing to prevent me seeing if the engine was at the head of the cars; when I stood at the gate of Mrs. Rodes' and looked straight up the track there was nothing to prevent me seeing the engine at the head of the cars; I can see the engine when there are no cars in front of me to prevent my seeing it; I went up a few steps to examine if there was an engine and there was none. I could see down to the end of that string of cars and there was no engine.

On redirect examination this witness stated that she had to walk a few steps towards the Rodes house to see the end of the string of cars; that she didn't look anywhere else for an engine and that she couldn't have seen anywhere else.

Edward Wright testified: I live on Independence avenue and work at the Zenith mills; have been working there a little over a year; in going to the mill I go down Gillis street to First and up First to the mill. On the day of this accident I was loading cars at the mill; first

noticed this opening at noon when I went to dinner at Mrs. Rodes; going to dinner I went under the cars on the track next to the mill and crossed the place where Sites was injured; I returned the same way, heard a little girl hollow, this attracted my attention to the accident; the place this accident occurred or about that place is used for a crossing generally by people going back and forth; quite a number of working people go to work backwards and forwards morning and evening; more at that time than any other time; the mill hands use that spring in the summer when the ice man don't come around; they cross the tracks and go through the cut by Mrs. Swinney's house; the school children cross at the place where Sites was injured or a little below that; when mud track is full of cars the only crossing is in front of Mrs. Rodes' house, unless they crawl under or go over the cars; at the time of this accident the tracks were full of cars on account of harvest time; when you come down the gulch and mud track is full of cars they cross in front of the Rodes house, by passing the receiving track; I cannot say it is the regular crossing place; it is usually used; when mud track is full of cars they cross almost in front of Mrs. Rodes' house.

On cross-examination he testified: People cross at the mill and east of the mill wherever they find an opening in the cars; no regular crossing. In going to dinner that day I had to crawl under the first string of cars, then went down and found this opening and crossed over almost in front of Mrs. Rodes' house; I do not remember how I got through the day before; sometime the opening is at one point and sometimes at another; sometimes you have to go zig-zag; the openings are not made straight; there is no special place where the railroad always keeps an opening through the cars standing on the receiving track; they come as a result of the way the cars happen to be set in; one pull of cars would be set in and go pretty near the west end of the Belt

receiving track, then another car will come that will leave an opening; another pull be set in that will leave another opening; that is the way they are formed; there is no special place kept open between the cars in front of Mrs. Rodes' house.

Charley Burns testified substantially as follows: I am 14 years old and live at Second and Tracy street; have lived there about two years; on the day of this accident I was sweeping wheat out of the car east of where the accident occurred; the car I was in was standing by itself east of this train of cars; I passed this opening; it was about four feet wide; mud track was full of cars; there were no cars east of the one I was in; there was a string of cars east of me but not on the same track; the string of cars west of me bumped against the car I was in; there was no whistle blown or bell rung before the bump; I was where I could have heard it; when the bump came I heard Mr. Sites say, "Oh, My God!;" I jumped out of the car and ran to where he was lying; the switching crew had gotten to him before I reached there; the head switchman of the Chicago & Alton was taking his name. I had been there about three hours before the accident; the cars west of me and those on mud track were there all that time; when I came down from the west end of the string of cars there was no switch engine around there; the Chicago & Alton switch engine was there three hours before but not on this track. There is a path coming down from the spring and goes over the crossing; right across Forest avenue; it goes right across the track there from the spring; people on the northwest side of the mill come up by Rodes' and around there to that gulch; a good many do that; some cross on the west part of the mill and some at the east part, where Forest avenue runs through; people north and west of the mill cross in front of the Rodes' house; almost all the people on the north of the track use that spring; they have to cross the track to get to it; I see one or two people come

off the hill and go down to the mill and other places across the track; there are four houses on the north side of the track; on the south side there are three houses on the hill and four along the side of the hill.

On cross-examination he testified: I was sweeping wheat out of the cars for my chickens; there were seven or eight cars ahead of the car I was in, then this space and then the car I was in; these cars did not run west as far as Gillis street; it is pretty near 500 feet from the point where Sites was injured to Gillis street; these cars would take up about 300 feet; I was down to Gillis street and remember that the cars did not run down there; I came down Gillis street and down the track; people coming down the draw would cross over mud track if they could get through the cars and walk over to the opening east of the mill; lots of them do that that are going to the north; if they find the track full they had to go west until they found an opening; there was no regular place for an opening between the cars.

J. D. Wilkinson testified: On the day of the accident I was working at the Zenith mills; had been working there something over a year before the accident; people living on the north and south sides of the track are accustomed to cross the track along about where Sites was injured, in front of the Rodes house; mud track is generally filled with cars; at that season of the year it is generally filled; people have been crossing in front of the Rodes house ever since I have been there; I see children crossing at about that place; don't know whether they are going to school or not; a little girl told me about the accident; Troost avenue if cut through would cross the tracks at the east end of the mill near Mrs. Rodes' house; Sites was lying right in front of this house; I usually crossed where Sites was injured.

On cross-examination he testified: In crossing the tracks I crossed at different places, according to where I found an opening; do not always find the opening at

the same place; if I had to go too far to find an opening I would climb over the cars; people cross at different points between Gillis and Lydia avenue; most of us cross in front of the Rodes house; I have seen them cross the tracks diagonally from the hollow to the east end of the mill; the Rodes' house is probably a half a block from the entrance of the draw.

Mrs. Harriet Burns testified substantially as follows: I live in the bottom close to the Zenith mills; I have lived in that neighborhood 16 years; in the last four or five years I have noticed the people crossing the tracks and would say they are all accustomed to crossing there by Mrs. Rodes' house, not just exactly at one place, but somewhere right close there; I had to use water from this spring for quite a while, also sent the children after water; we usually crossed back and forth at this place where Mr. Sites was injured; mud track runs within ten feet of my front gate; it is usually filled with cars they are not using; they usually left a passage way when the track was filled with cars; I don't think they left it at Mrs. Rodes' house; the passage way was generally left right in front of my gate; the passage way is just a little east of the Rodes house, about straight across the end of mud track.

On cross-examination she testified: I live about 200 yards east of Mrs. Rodes' house, nearer the road; people pass back and forth over the track there; we live under the hill and there is no passage way without coming there; they pass through the cars and over the tracks at the mouth of the gulch; go diagonally over to the east end of the mill; coming down the gulch going to the coal yard they have to go to the east to cross the tracks; some pass over the track west of the mill, but it is not a public crossing; this gulch comes down across the track at the east end of the mill; most of the crossing is at that place; the reason of that is there is an open space with a path winding around in

between these houses; the gulch is about 100 feet from the Rodes house.

G. S. Peppard testified substantially as follows: I am a postman and have been in the service 28 years; when Mr. Sites was put on duty he was given the west limits of my route, which extended to Gillis street; I traveled this route twice a day for 21 years; Sites traveled it three times a day; he was assigned to this route the 1st of July, 1901. In making my route I had to cross from north of the Zenith mills over to Mrs Rodes' house and deliver her mail, then crossed back to the Zenith mills and made my delivery; I generally crossed in front of Mrs. Rodes's house possibly a little close to the west end of the mill; generally an opening in front of her house or a little to the west; the track in front of her house from the opening in front of her to Gillis street was generally full of cars; mud track was generally full of cars also; people generally crossed the track in front of Mrs. Rodes' house — anywhere along there; people going over to get water would generally cross the tracks in front of Mrs. Rodes' house; I crossed wherever I could; I have gone under the cars, gone over them and gone around them; there was more often an opening there than any other place; people crossed at this place ever since I carried mail there; persons living diagonally, that is, below Mrs. Rodes' house or above, or anything of that kind, they might go in a different way, but persons calling on Mrs. Rodes or her family or boarders, anything of that kind, generally crossed in front of her house; this was the best opening always.

On cross-examination he testified: Delivering mail there I noticed people crossing the tracks at different points between Gillis and Lydia avenue; speaking generally, the people crossing these yards had to go according to where they could find an opening through the various strings of cars; this opening varied according to the way the cars happened to be placed in there; it

was not always at the same place because it was a switch track; people living west of the mill would cross west of the mill and those living east of the mill would cross east of the mill; the public generally that crossed at Mrs. Rodes' house were people going to her house, boarders, some of the family or myself; as a general proposition I had more mail for the Rodes house than any others on that side; after delivering mail to her house and other families living on the south side of the tracks I would go down to Swinney's and then cross over to the mill, crossing east of Mrs. Rodes' if I could find an opening; it was the shortest, quickest and handiest for me to cross in front of her house; generally crossed where I could find an opening; years ago there was a spring between the Rodes house and the gas house; at that time people crossed west of her house going to that spring.

The plat hereto referred to is here inserted. The Chicago & Alton tracks appearing in white, the Kansas City Suburban Belt tracks in yellow and the Missouri Pacific tracks in red:

At the close of the evidence on the part of the plaintiff defendants requested the court to instruct the jury to return a verdict for the defendants. This instruction, which was in the nature of a demurrer to the evidence, was by the court denied, to which action of the court defendants duly preserved their objections and exceptions. The court then proceeded to instruct the jury (which instructions will be given attention during the course of the opinion), and the cause was submitted to the jury and thy returned a verdict finding the issues for the plaintiff and assessing her damages at the sum of five thousand dollars.

After unsuccessful motions for new trial and in arrest of judgment defendants in due time and proper form prosecuted their appeal to this court and the record is now before us for consideration.

OPINION.

The record in this cause presents but two legal propositions for consideration:

1. It is earnestly insisted that the trial court committed error in submitting this cause to the jury upon what is commonly called the humanitarian doctrine.

2. It is contended that the facts developed upon the trial were insufficient to warrant the court in submitting the cause to the jury upon any theory.

The instruction of the court which undertakes to cover the entire case, and upon which appellants predicate their complaints of error, was as follows:

"The jury are instructed that if you believe from the evidence that Wm. R. Sites was injured and killed on or about the sixth day of September, 1901, and that at that time and for a long time prior thereto, the plaintiff, Laura A. Sites, was and had been the wife of said Wm. R. Sites; and that on or about the sixth day of September, 1900, the defendants, Knott and Swinney, were appointed by the United States Circuit Court of the Western Division of the Western District of Missouri, receivers of all the property and effects of the Kansas City Suburban Belt Railway Company, and that thereupon the defendants took possession and control of said property and continuously thereafter, and on said sixth day of September, 1901, managed, controlled and operated the said railroad, and the cars and engines thereon through their servants and agents; and that defendants' said servants and agents were on the said sixth day of September, 1901, engaged in the operation, control and management of a certain switch engine on the tracks of the said Suburban Belt Railway Company at or about the intersection of said tracks with Gillis street in Kansas City; and that on said day there were at and near the intersection of Troost avenue and First avenue, in Kansas City, Missouri, a num-

197 Sup.—45

ber of railroad tracks, extending in an easterly and westerly direction, along which there were stationed and standing a large number of cars attached together and extending from about Gillis street eastward to a point at or near the intersection of said tracks with said Troost avenue, and that at the place last aforesaid said cars were separated; and that on said date, and for long time prior thereto, the locality on both sides of said tracks at the place last aforesaid was a populous neighborhood, and that on said date, and for a long time prior thereto, persons and the public in general having occasion so to do, were accustomed to, and did, continuously cross and re-cross said tracks at the place last aforesaid, about the point where said cars were left separated as aforesaid, and that defendants, through their servants and agents, knew thereof, and that on or about the date last aforesaid, the said William R. Sites was lawfully pursuing his business of distributing mail as a United States postman, and that he, while in the exercise of that degree of care which an ordinarily careful and prudent person would exercise under the same or similar circumstances, and while attempting to cross said tracks near their intersection with Troost avenue, and where said cars were left separated as aforesaid, was run against, crushed and killed by the said cars so standing on one of said tracks being with force and violence propelled against him, and that said cars were propelled against him by the said switch engine then being operated and controlled by the servants and agents of defendants in charge thereof, and that said servants and agents of defendants in charge of said switch engine negligently propelled the same against said cars with force and violence without giving a signal or warning of the approach of said engine or cars and thereby caused the said injuries to said Sites from which he died; or if the said servants and agents of defendants in charge of said switch engine caused or permitted the same to be propelled against said cars and

the said cars against said Sites and internally injured him after they saw or by the exercise of ordinary care might have seen, said Sites approaching and attempting to cross said tracks on which said cars were standing and in a situation of peril from said cars, and after the said servants and agents in charge of said switch engine might, by the exercise of ordinary care, have stopped said engine and avoided such injury, then your verdict should be for the plaintiff in the sum of five thousand dollars."

It will be observed that this instruction embraced two theories upon which this cause was submitted to the jury: First, that the place where plaintiff's husband was killed was a regular and recognized crossing of the railroad tracks for the use of the public, and at the time he was killed there was an opening for the purpose of allowing persons to pass over said tracks at said crossing and that the agents and servants of defendants, operating the engine and cars on said tracks, negligently and carelessly caused said opening to be closed up, without giving any signal or warning of the approach of the engine, thereby causing the injuries to and death of plaintiff's husband. Second, that "if the said servants and agents of defendants in charge of said switch engine caused or permitted the same to be propelled against said cars and the said cars against said Sites and intentionally injured him after they saw, or by the exercise of ordinary care might have seen, said Sites approaching and attempting to cross said track on which said cars were standing and in a situation of peril from said cars, and after the said servants and agents in charge of said switch engine might, by the exercise of ordinary care, have stopped said engine and avoided such injury, then your verdict should be for the plaintiff in the sum of five thousand dollars."

I. We have indicated in the statement of this cause substantially the testimony as applicable to the

vital questions presented in the record and have care-
fully read in detail all of the testimony elicited upon
the trial of this case and we are unable to discover such
a state of facts surrounding this accident as authorized
the court to submit the cause to the jury upon what is
known as the humanitarian doctrine. This doctrine is
now well settled in this State and proceeds upon the
theory that the party injured was in the first instance
guilty of some negligence by placing himself in a pos-
ition of peril, but that such negligence would not pre-
vent a recovery if the agents and servants operating
the engine and cars could have seen him in such posi-
tion of peril in time to have avoided the injury by the
exercise or ordinary care on their part.

The testimony in this case is by no means clear
and satisfactory as to the approach of this engine to
Gillis street preparatory to coupling to the string of
cars which were standing on the tracks upon which
plaintiff's husband was killed. However, for the pur-
pose of treating of this part of the instruction, which
submitted to the jury the question of the negligence of
the defendants in failing to stop the engine in time to
have avoided such injury after having seen the deceased
or by the exercise of reasonable care could have seen
him in a position of peril, it may be conceded that this
engine was coming from a southwesterly direction
through a deep cut which hid the view of the place
where plaintiff's husband was undertaking to cross the
track, until it had almost reached the west side of Gil-
lis street. The facts developed upon the trial of this
case indicate that it was the purpose of plaintiff's hus-
band who was a postman, and had mail for delivery
at the Zenith mills, to go from the Rodes cottage across
the track where he was injured to the Zenith mills.
The testimony further shows that there was a pile of
ties south of the track on which deceased was injured
and an open space betwen this pile of ties and the track
of about five feet, and the only opportunity that the

defendants' employees on the engine could have of seeing the deceased would be as he passed north of the pile of ties along this five-foot space. Let the presumption be indulged that the engineer saw the deceased as he walked along in this five-foot space in which the testimony indicates that he might have been enabled to see him, must not the presumption also be equally indulged that the deceased saw the approaching engine?

The facts in this case show that the deceased was in no perilous position until he undertook to go through the small opening between the cars on that track. We are of the opinion that it is logical that if the engineer saw the deceased approaching this open space where he intended to cross going to the Zenith mills, it must be presumed that the deceased also saw the engine, and that if this was a regular and recognized crossing, both by the public and the defendants, as contended for by the respondent, with the presumption that the deceased saw the approach of the engine, in view of the fact that the engine was about to couple upon the string of cars on the track which the deceased was seeking to cross, the engineer had the right to presume that the deceased would take no steps that would bring him into danger of the cars in the closing of the opening.

The law upon this branch of this instruction may thus be briefly stated: If the place where the deceased was killed was a regular and recognized crossing of the track at that point by the public and the defendants, and the engineer saw the deceased approaching the crossing, he had the right to presume that the deceased had due regard for his own safety and would stop before he reached the point of peril patent before him. The physical facts show that the crossing of the tracks as indicated on the plat filed in the statement of this case, was at all times attended with peril and danger to the pedestrian; in other words, the situation confronted those who desired to cross these tracks with

danger and peril. Therefore, if it be conceded that the engineer could have seen the deceased, it must also be conceded that the deceased could have seen at least the engine which the engineer was operating, and indulging the presumption that he did see the engine and was approaching a crossing of the track for pedestrians, it is manifest that the engineer had the right to indulge the presumption that the deceased would not undertake to pass through the small opening left between the cars upon the track upon which he was injured. This branch of the instruction must not be confounded with the other theory upon which this cause was submitted to the jury, that is, of the failure to give a warning or signal of the closing of the opening between these cars at a crossing for pedestrians. For upon this proposition it is not a question as to whether or not it was the duty of the engineer to give a signal or warning; that is involved in another separate and distinct proposition. The simple question here confronting us is whether or not the facts as developed justified that part of the instruction which authorized a recovery upon the alleged negligence of defendants in failing to stop the engine in time to have avoided the injury. The failure to ring a bell or to give any warning has no application to the question now under discussion.

The rule as above indicated, applicable to the facts in this case, is fully supported by the uniform expression of this court in an unbroken line of decisions announcing the ruling in cases embracing a similar state of facts. There is, however, a clear and well-preserved distinction applicable to infants to whom contributory negligence can not be applied and to other persons where the facts upon the trial of the cause show that the party approaching the crossing is obviously unmindful of the approaching of the train or is in some way hampered or impeded so that he cannot stop and let it pass. The facts in this case do not place the deceased as falling within the line of cases preserving this distinction.

He was a man of ordinary intelligence; no complaint is made of his eye-sight or hearing and he was simply approaching what respondent contends was a regular crossing, and the engineer had the right to indulge the presumption that the deceased would stop before undertaking to cross through the small open space between the cars on the track. An infant incapable of appreciating danger is in a perilous position within the contemplation of the rule announced, when seen by the operators of the train approaching a crossing, but such is not the case with an adult. This distinction was drawn in the case of Frick v. Railroad, 75 Mo. 1. c. 608. It was said by the court in that case that "the defendant contends that the first and second instructions given at the request of the plaintiff, and the first and second instructions given by the court of its own motion, are erroneous, in that they fail to tell the jury that the defendant was liable only in case its servants failed to exercise ordinary care to prevent the injury, after they became aware of the danger to which the plaintiff was exposed. This would undoubtedly be a proper qualification of the instructions referred to, if this were the case of an adult who had been guilty of contributory negligence."

Where persons are upon the railroad track in plain view of those operating the engine, apparently unmindful of the approach of such engine, or where there is something in the conduct of the person approaching the crossing and about to cross the track at a point where the trainmen are required to keep a lookout, showing that he does not realize the danger or is in such condition as not to appreciate it, then the humanitarian doctrine is applicable and in full force. [Kellny v. Railroad, 101 Mo. 67; Bunyan v. Railroad, 127 Mo. 12; Chamberlain v. Railroad, 133 Mo. 587; Holden v. Railroad, 177 Mo. 456; Morgan v. Railroad, 159 Mo. 262; Klockenbrink v. Railroad, 172 Mo. 678.]

In Bunyan v. Railroad, 127 Mo. 12, the testimony showed that the gripman discovered that deceased was staggering and did not know what he was doing when at least five or six feet from the track. It is clear that a party in that condition approaching a track was in a perilous and dangerous condition before going onto the track and no presumption could be indulged by reason of such conduct that the deceased would stop and avoid the danger, and the court very clearly announces the rule under that state of facts, that "It was his [the gripman's] duty under these circumstances to have at once taken precaution to prevent the collision. He should not have deferred action until the deceased had placed himself in a dangerous position, when it was manifest to him that he was heedlessly staggering into it." On the other hand, it has been uniformly held by this court, in the absence of any testimony showing the condition of the party approaching the railroad crossing, that he is unmindful of the approaching danger or that he is in such a condition as not to appreciate it, those in charge of the train have the right to presume, in the first place, that such person will keep out of danger and not until they have good reason to believe he will not do so, are they required to use all proper means at their command to prevent injuring him. [Boyd v. Railroad, 105 Mo. 371; Guyer v. Railroad, 174 Mo. 344; Van Bach v. Railroad, 171 Mo. 338; Thompson v. Railroad, 93 Mo. App. 548; Davies v. Railroad, 159 Mo. 1; Reno v. Railroad, 180 Mo. 469; McGauley v. Railroad, 179 Mo. 583; Evans v. Railroad, 178 Mo. 508; Roenfeldt v. Railroad, 180 Mo. 554.]

The rule is nowhere more clearly or tersely stated than in Guyer v. Railroad, 174 Mo. 344. VALLIANT, J., in speaking for the court, thus stated the law: "The theory of the plaintiff is that the man running the engine saw, or ought to have seen, her husband, as he was thus approaching the tracks. Suppose the engineer saw him; what did he have a right to presume? It was day-

light, the engine coming was in as plain view to the man on the roller as he was to the engineer. There was nothing to suggest to the engineer that the other was oblivious to the situation, or that he had failed to use his eyes and see what every one else there saw. Any reasonable man in the engineer's position would presume that the man on the roller would stop before crossing and let the engine pass.''

The testimony of nearly all the witnesses in this cause indicates that the space between the cars through which the deceased was attempting to pass, was only about two feet. Under the facts developed in this case, his position was not a dangerous or perilous one until he stepped upon the track, and there is an entire absence of any testimony that after he did so defendants' employees could have in any way averted the injury.

We have carefully considered all of the testimony as applicable to the proposition now under discussion, and the conclusion is inevitable, as was ruled in the cases of Guyer v. Railroad, and Van Bach v. Railroad, supra, that even though it be conceded that the engineer saw the deceased approaching dangerously near the crossing, yet he had a right to presume that Mr. Sites, who was injured and killed, had used his eyes and would act as a reasonably prudent man under the circumstances and for his own preservation. On the theory that the engineer saw the deceased and that the deceased saw the engine, the presumption logically follows that the deceased would stop before undertaking to cross the track through this narrow passageway between the cars. That this is what a careful and prudent person would have done under the circumstances is emphasized by the conduct and actions of plaintiff's own witness, Mrs. Stanley, who crossed at the same place only a few minutes before Mr. Sites was killed. She stopped and would not undertake to go through that narrow passageway until she had made an investigation as to

whether an engine was preparing to couple upon the string of cars located upon said track.

The testimony in this cause did not warrant the submission of the case to the jury upon the theory of the humanitarian doctrine, and the submission of it to the jury upon that theory constitutes reversible error.

II.  This brings us to the consideration of the second and only remaining proposition involved in this proceeding, that is, was there sufficient testimony to authorize the submission of this cause to the jury upon the charge of negligence of the defendants in failing to give any signal or warning of the approach of the engine, by which the space or opening between the cars on the railroad track through which the deceased was attempting to pass, was closed?

At the very inception of the consideration of this proposition it is manifest that the testimony on the part of the plaintiff is by no means clear or satisfactory. The crucial question upon this branch of the case is the nature and character of the crossing where plaintiff's husband was killed. We think it is clear that the testimony in this case fails to show any regularly-used open public street crossing of the tracks at the point where plaintiff's husband was killed; hence the question is narrowed down as to whether it was such a crossing as is indicated by the allegations in the petition of plaintiff, that is, at a point where "a great number of people are and were at the times herein referred to and for a long time prior thereto accustomed to and did daily cross the said tracks, of all of which facts defendants, through their servants and agents in charge of their said railroad, engines and cars, had notice; that at all the times herein referred to the said William R. Sites, while engaged in the service of the United States Government in carrying and delivering mail to the residents and persons engaged in business at or near the intersection of said railroad tracks with the

west line of Troost avenue in said city, was accustomed to and did as one of the public daily cross the said railroad tracks at and near the west line of the said Troost avenue and where the public were accustomed to and did cross as aforesaid.''

The testimony of the witnesses on the part of the plaintiff, as is substantially indicated in the statement of this cause, upon their examination in chief, tends to show that the point where the deceased was killed had been used for a number of years as a place for crossing the tracks by the public in that community and people having business in that neighborhood, but it will be observed upon cross-examination that nearly all of them state that there was no regular place of crossing these tracks in the yards; that people crossed at various places between Gillis street and Lydia avenue, whereever they could find an opening; in other words, that the place of crossing these tracks largely depended upon the convenience of the particular person and where an opening could be found through the cars, and in fact the record dicloses that there were instances, if no such opening was found, when persons would crawl under or climb over the bumpers on the cars.

While the point at which the deceased was killed may not have been an open public street, yet it does not follow that defendant owned no duty to the public in crossing its tracks at that point. If at the place where deceased was killed, the people for any considerable length of time, as is indicated by the allegations in the petition, had been accustomed to and did daily cross the railroad tracks at that point, and the defendant permitted them to cross, and recognized their right to do so, and in recognition of this custom and right on the part of the public to cross the tracks at that point, were in the habit of leaving openings for the public to pass over their tracks at that point, under such circumstances defendants owed it to the public and those who were in the habit of passing through such openings to give

some reasonable or suitable warning of their intention to close this opening, and it constitutes negligence if they failed or neglected so to do. On the other hand, if these railroad tracks were in the yards of the railroad company, across which there were no open public streets, and the defendants did not recognize the right of the public to cross the railroad track at the point where deceased was killed, and did not by its conduct or actions in respect to the management and control of such tracks, indicate its recognition of such right, and the openings between these cars were merely chance or accidental openings, then persons who sought to pass through such openings would not be warranted in treating such openings as an implied invitation to use such openings for a crossing, and the defendants would not be required under such circumtances to give a warning or signal of the closing up of any such accidental or chance opening, and would not be liable for injuries sustained by others in undertaking to use such openings as a passageway over the tracks by reason of the failure to give such signal or warning.

If the point where plaintiff's husband was killed was a crossing for the public as herein indicated, and the public had for any considerable time been using same, and the right of the public to use such crossing was recognized by the defendants, and that it was the customary and usual method of placing cars on said tracks so as to leave an opening for the public to cross, and plaintiff's husband came to said crossing and found such opening, then he was justified in acting upon this implied invitation to cross, and it was unquestionably the duty of the defendant to give some suitable or reasonable warning before closing such opening. On the other hand, it must not be overlooked that the opening must be of such a nature and character as to indicate to a reasonably prudent man that the defendants intended that the public should use such opening as a crossing.

The case of Gurley v. Railroad was three times before this court: first, in the 93 Mo. 445; second, in the 104 Mo. 211, and third, in the 122 Mo. 141. The rules of law as announced in that case have not been departed from by this court, and we know of no case where the law as applicable to the proposition now in hand is more clearly or correctly stated. In that case plaintiff sought a recovery for injuries received while crossing through a passageway betwen the cars of the railway company at the town of Pleasant Hill. The testimony in that case clearly indicated the point of crossing, and it was shown by the agent of the defendant that it constructed a sidewalk between its rails to conform to the walk coming down from the hotel to its depot, and that he kept a space open between the cars for the public travel. In fact, the great weight of the evidence showed that more citizens of Pleasant Hill used this crossing than any other crossing in the city, and it had been used for a period of twenty years. There was testimony in that case showing that the defendant had been in the habit of leaving an open space for the passage of the public at this particular point crossing the tracks. This cause was reversed and remanded by this court in the 93 Mo., with the same result in the 104 Mo., and the judgment for $6,000 was affirmed in the 122 Mo. GANTT, J., speaking for this court in the 104 Mo., in that case, in discussing the rules of law applicable to the leaving of a space or opening between the cars at a point where the public had been in the habit of crossing, said: "Now, it may be conceded that if when plaintiff came there the cars were opened as if to invite the public to cross, and it was the custom of the defendant when it had finished its switching to leave an opening between the cars at this crossing for the public, then unquestionably it would be the duty of defendant to give some suitable or reasonable warning before closing the same, for the protection of those who used the crossing, and plaintiff might well have sup-

posed it would be safe to cross if he was not otherwise advised that the defendant was about to close this gap or opening, and acting upon this invitation he would be protected.'' During the course of the opinion in that case this court announced in no uncertain or ambiguous terms what should have been told the jury as a guide in reaching their conclusions. It was said: ''We hold that it should have distinctly said to the jury that if the company was in the habit of making these openings for the public to pass over its track at this point, and when plaintiff came to this crossing these cars were so separated as to induce plaintiff and the public to believe the company intended they should use it for a crossing, and he did so believe, then plaintiff was justified in acting upon this implied invitation, and defendant owed it to him, under such circumstances, to give him some reasonable or suitable warning of its intention to close this opening, and it would be liable to plaintiff if it neglected so to do. On the other hand, the court should have said to the jury that, if the company had placed its cars in such close proximity that it was dangerous or hazardous for anyone to attempt to pass between them, and it would appear to a reasonably prudent man that the company did not intend the public should use said opening as a crossing, then the implied invitation to pass was revoked, and plaintiff was not justified in risking himself between the cars at said crossing. This was a question for the jury, under the evidence and proper instructions.''

It was further stated during the course of the opinion in that case, that ''common prudence and care required of plaintiff to look and ascertain whether he could safely pass through that train, and common prudence dictated that he should not recklessly expose himself to the danger of being crushed between those cars. Their very position was a warning to a man of ordinary prudence to stay out. The plaintiff's conduct savor of reckless rashness.''

Now, while it must be conceded that the law was properly and correctly declared in Gurley v. Railroad, and also from the disclosures of the record, had Mr. Sites exercised the same care and prudence that Mrs. Stanley, a witness for the plaintiff, did, before undertaking to enter the narrow passageway between the cars, that this accident would have been avoided, it by no means necessarily follows that the instruction given by the court, at the request of the plaintiff, upon this branch of the case was erroneous.   Upon plaintiff's theory of this case it declared the law correctly, and if the defendants desired the questions more sharply presented, and the facts in this case were sufficiently similar to those in the Gurley case to warrant the court in declaring the law as indicated in that case, it was clearly the duty of the defendants to request such declarations as would properly submit the questions to the jury.

If the plaintiff's husband was killed through the negligence of the defendants in failing to give a proper signal or warning of the closing up of the opening between the cars at the point where death resulted, then she is entitled to recover.   But on the other hand, no essential fact should be ignored, and if the death of the husband of plaintiff resulted from his own negigence, there should be no recovery.

The affirmance of this judgmnt in favor of plaintiff can only be justified after a submission of the cause to the jury upon instructions which are applicable to the essential facts necessary to a recovery.

We have indicated our views upon the legal propositions presented by the record before us, and to the end that the parties may be fully heard upon the facts of this case and the law declared covering every feature of the case to which the testimony upon a new trial may be applicable, the judgment should be reversed and cause remanded, and it is so ordered.

All concur, except *Graves, J.,* not sitting.