WILLIAM PETERIE, Respondent, v. METROPOL-ITAN STREET RAILWAY COMPANY, Appellant.

Kansas City Court of Appeals, March 2, 1914.

1. NEGLIGENCE: Damages: Personal Injuries: Crossing: Sufficiency of Evidence. Plaintiff, driving a lengthened, empty lumber wagon, approached a crossing with his team in a walk. An electric car was also approaching the crossing. Plaintiff knew the car was coming, but thought he had time to cross before it, and was looking in the other direction for a car on the parallel track. When the car was 200 feet from the

crossing it was manifest to the motorman that plaintiff was going to cross and was oblivious to his danger as he was looking the other way. The car could have been stopped in 100 feet but no attempt, was made to stop, or even slacken it until the car struck the wagon just as the rear end of the wagon was about to clear the track. There being substantial evidence to support the foregoing facts, it was sufficient to take the case to the jury on the humanitarian rule.

2. ————: ————: Humanitarian Rule: Contributory Negligence. If, after the motorman saw plaintiff was going into danger and was oblivious thereto, he had time, by the exercise of ordinary care and with due regard to the safety of his passengers, to have avoided the collision by stopping or slackening the speed of his car, and he negligently failed to do so, his master will be liable under the humanitarian rule notwithstanding plaintiff was guilty of contributory negligence in going into danger.

3. ————: ————: ————: ————. The fact that plaintiff in his mind knew a car was coming but erroneously thought he could cross would not absolve defendant from liability under the humanitarian doctrine, if the motorman could see by plaintiff's actions that he was going to cross and was oblivious to his danger, and there was then still time to stop or slacken the car by the exercise of ordinary care. The plaintiff's knowledge that a car was approaching would not prevent him from being oblivious to his danger if he erroneously thought he could cross, and was manifesting to the motorman that he was going to cross and was not aware of the danger.

4. PLEADING: Proof Damages Confined Within Scope of Those Pleaded. All injuries which naturally result from the main or specific injury alleged may be shown without being specifically pleaded provided it is a natural consequence, one that is usual and can reasonably be expected to follow from the injuries alleged, though not a necesary or inevitable consequence.

5. ————: ————: Proof of Future Brain Trouble Admissible Under Allegation of Permanent Injuries to Head, Mind and Nervous System. Where the petition alleged permanent injuries to the head, mind and nervous system, evidence of future brain trouble was admissible as against the objection that it was not within the scope of the pleadings.

Appeal from Jackson Circuit Court.—*Hon. W. O. Thomas,* Judge.

AFFIRMED.

*John H. Lucas* and *Chas. N. Sadler* for appellant.

*Botsford, Deatherage & Creason* for respondent.

TRIMBLE, J.—Defendant operated a double track electric railway between Kansas City and Independence. At a public road crossing thereon, one of defendant's cars struck an empty lumber wagon driven by plaintiff, throwing it to one side and severely injuring plaintiff. He sued for damages on the ground that the injuries were caused by the negligence of defendant under the humanitarian rule. The jury found in favor of plaintiff and defendant appealed.

The collision occurred on the afternoon of February 26, 1910. The county road, at the point in question, is macadamized and runs east and west. The two tracks of the railway run north and south and cross the county road at right angles. The car that did the damage was running south on the west track and struck the rear end of plaintiff's wagon as it was travelling westward over the crossing. As the wagon was struck on the rear end and thrown to the west side of the track, the car must have struck it just at the moment it was about to clear the west or last track to be crossed. The speed of the car in approaching the crossing was twenty-five miles per hour and the evidence tends to show that this speed was not reduced until the instant of the collision.

As plaintiff approached the crossing from the east there was nothing to prevent him from seeing the car nor the motorman from seeing his wagon, and each testified that he first became aware of the approach of the other vehicle when the car, which was running up grade, was two hundred feet from the crossing. Plaintiff says that his team then was ten feet from the east track, and, as the two tracks were nine feet apart, the heads of his horses were about twenty-four feet, and the rear axle of his wagon (over which he was sitting)

was about forty-nine feet, from the west track, which, as stated, was the track on which the car was approaching.

The team was going in an ordinary walk, and, concluding he had ample time to cross ahead of the car, plaintiff looked in the opposite direction to ascertain whether or not a car was coming on the east track. There was a substation, or power house, at the southeast corner of the intersection and plaintiff claims that he had to look southward until he passed from behind the power house before he could be sure that his crossing would not be endangered by a northbound car and that he did so look. Then he looked northward and saw that the approaching car was only forty feet away and was coming on with unabated speed. At that time, however, the front wheels of his wagon had just passed over the west rail of the first track and his team was at the east rail of the west track and, of course, in the way of the oncoming car. His wagon had been lengthened to carry lumber and the distance from the heads of the horses to his position over the rear axle was about twenty-five feet. Fearing a collision and thinking he could not avoid it by backing the team or trying to turn them to one side, he urged them forward and had almost succeeded in clearing the track when the car struck the rear end of the wagon. Other witnesses introduced by plaintiff corroborate his statements that the motorman did not attempt to slacken speed before the collision, nor give any warning signals.

The motorman says the car was going twenty-five miles an hour and that the car was two hundred feet from the crossing when he first observed plaintiff approaching it. (This is the distance the car was from the crossing when plaintiff says he first saw it). But in other respects the motorman's vision differs from that of the plaintiff. The motorman says that when he saw plaintiff approaching, he sounded the gong,

and that plaintiff stopped his team in a place of safety and waited until the car was forty feet from the crossing when he suddenly started forward and attempted to cross in front of the car and that as soon as he did that, the witness exerted himself to the utmost to stop the car but was unable to avoid the collision which, he says, occurred between the car and the *front* end of the wagon. The testimony of the motorman is supported by that of other witnesses introduced by defendant.

We must, however, accept plaintiff's version of what he did rather than the motorman's, as the jury found for plaintiff, thus requiring us to give full weight and credit to all of plaintiff's evidence and to every inference which can be legally drawn therefrom.

The first point urged by defendant is that the petition states no cause of action because it is a *felo de se*. That is, that the petition contains two different allegations of negligence which are necessarily so repugnant to each other as to be mutually destructive. To be so, they must be such that if one is true the other must necessarily be untrue. The point is based upon defendant's claim that the petition, when analyzed, contains two specifications of negligence, to-wit, *first*, that the motorman *could have stopped* the car after he saw, or by the exercise of ordinary care could have seen, plaintiff in a perilous and helpless situation, and negligently failed to do so; *second*, that he was running the car at such high speed that he *could not stop*. Of course, if the petition, in one breath, charged the motorman with negligence in failing to stop the car, and in the next breath with negligence in running the car at such high speed that he could not stop it, the petition on its face would contain mutually destructive allegations. In that case, it would state no cause of action whatever, but would be a *felo de se* as held in the case of Raming v. Railway, 157 Mo. 477, l. c. 508, and in Gabriel v. Railway, 130 Mo. App. 651,

l. c. 654. But we do not think the petition in this case contains specifications of negligence that are necessarily contradictory. In the first place, the petition is entitled to a liberal construction and to every reasonable intendment in its favor since it was not challenged in any way until after verdict. [Smith v. Railroad, 129 Mo. App. 413, l. c. 422; Price v. Maryville, 161 S. W. 295.] It is true a petition that destroys itself is no petition, and therefore states no cause of action; and a petition which states no cause of action presents a defect the fatality of which can be raised in any court and at any stage of the case. [Chandler v. Railway, 251 Mo. 592.] But this does not interfere with the rule that a petition that is not attacked until after verdict entitled to every reasonable intendment in its favor in determining whether or not it states a cause of action. Without using much liberality, we do not think the petition is self destructive. In reality there is but one act of negligence charged, that of negligence under the humanitarian rule. The allegations thought to be conflicting, when read in the light of their context, amount to nothing more than an assertion that the motorman did not immediately proceed to bring his car under control after he discovered, or should have discovered, the peril of plaintiff. This construction of the petition is further borne out by the fact that this was the sole issue, as to negligence, contained in the instructions upon which the case was submitted to the jury. Even if the petition, in one view, may appear to contain two separate grounds of negligence in one count which seem repugnant, in the absence of any objection thereto before verdict, we are not disposed to look with favor upon an objection made after that time unless the petition is so utterly defective as to state absolutely no cause of action. [Stiller v. Railway, 159 Mo. App. 452; Flynn v. Railway, 166 Mo. App. 182.]

It is next urged that the evidence fails to show

that his injury was proximately caused by the negligent failure of the motorman to stop the car after the peril of plaintiff became apparent. As said above we are required to give full weight and credit to plaintiff's evidence on this question, and it discloses a state of facts from which an inference of negligence on the part of the motorman follows. According to that evidence plaintiff's horses were traveling in a walk and when their heads were twenty-four feet from the track, the motorman, two hundred feet from the crossing, saw the plaintiff's wagon continue to approach with plaintiff *looking in the opposite direction watching for a northbound car.* When the motorman saw that the team was not going to stop and that plaintiff was looking south, he should have realized that if he did not slacken the speed of the car or stop it, a collision was bound to occur. The evidence is, however, that the car kept right on and no effort was made to avoid the collision; that the speed of the car was not slackened until the instant of the collision; and that then the car stopped within a car length, or, as the motorman says, in about sixty feet. This shows too that the negligence of the motorman was the proximate cause of the injury, and also meets the claims that there was no evidence that the car could have been stopped after plaintiff's peril was seen. Because evidence of the distance in which a car was actually stopped is evidence of the distance in which it could have been stopped. A mere slackening of the car, without stopping, would have avoided the collision in this instance since the wagon was nearly over when struck. The main contention, however, is that the motorman's negligence was not the proximate cause of the injury because plaintiff saw the car when it was two hundred feet away and yet continued on his way, and, therefore, it was his own negligence which caused, and did not merely contribute to, the injury, and hence there is no room for the humanitarian rule. But this

overlooks the point that *after* plaintiff was observed to have begun the attempt to cross and was seen to be looking the other way, and *was going to continue cross-ing* while looking the other way, the motorman could have placed his car under control and avoided the in- · . jury. If, after plaintiff was thus seen going into danger while looking the other way, there was yet time for the motorman to avoid the collision, and he negligently failed to do so, defendant would be liable under the humanitarian rule notwithstanding plaintiff saw the car when it was two hundred feet away and erroneously concluded he had time to cross. In such case the only effect plaintiff's seeing the car at that distance could have upon the case would be in leading the motorman to believe when he first saw plaintiff that, since plaintiff knew the car was coming, he *would* stop before he got on the track although he had not stopped as yet. But the motorman says that the plaintiff was not looking at him when plaintiff approached the track. He does say that plaintiff stopped and waited until the car was only forty feet away and then suddenly whipped up and drove in front of the car. Plaintiff denies that he stopped, and says he was not looking at the motorman or car but was looking in the other direction. So plaintiff and motorman agree that plaintiff was not looking at the car. Consequently the only thing the motorman had to rely upon that plaintiff *would stop* and would *not* go on the track was the alleged *stopping of the team.* Consequently plaintiff's knowledge that a car was two hundred feet away did not absolve the motorman from the duty of avoiding the collision, if he could, when he saw that plaintiff was continuing on his way to cross and was looking the other way. For authorities supporting this view see Parish v. Railway, 140 Mo. App. 701; Dahmar v. Railway, 136 Mo. App. 443, l. c. 448; Murray v. Railroad, 108 Mo. App. 501. The fact that the crossing was not in the city but was on a country road

can make no difference. It was at a crossing much traveled, and if the motorman could see that plaintiff was not looking at the car but, by his actions, showed that he was intending to cross, and the motorman could have avoided the injury, by the exercise of ordinary care and with safety to his passengers, he should have done so. [Waddell v. Railway, 213 Mo. 8; Ellis v. Railway, 234 Mo. 657.] The only difference a country road crossing would make is that there the car would be expected to be going at a more rapid rate than on a city street, and this would increase the time and distance in which the car could be stopped and consequently increase the negligence of one attempting to cross in front of it. But in this case, the car was stopped in sixty feet after the collision, and, as the motorman says he began applying the air when he saw the team start up, that is, when the car was forty feet from the crossing, this was evidence that the car could have been stopped in 100·feet, and the motorman says he saw plaintiff when the car was 200 feet from the crossing, and plaintiff says his horses were then twenty-four feet from the track and continuing on their way with the driver looking south. So that there was evidence from which the jury could find that the car could have been stopped by the exercise of reasonable care after the motorman discovered that plaintiff was driving on to the track without looking. The fact that the collision occurred at a country road crossing instead of on a city street cannot absolve defendant as matter of law. That it occurred at such a crossing would render it more likely, as a matter of fact, that the motorman had less time in which to act than if it had occurred on a city street. It might also show that plaintiff had less reason to think he had time to cross than if it had been in the city, and therefore plaintiff's negligence in attempting to cross would be increased. But this would not absolve defendant, as matter of law. If it was manifest to the

motorman that plaintiff was oblivious to his danger, and the motorman could, by reasonable care and with safety to his passengers, have stopped or slackened speed and avoided the collision, and failed to do so, then defendant is liable, no matter how negligent plaintiff may have been originally. It is true the authorities we have cited in support of the view maintained herein require that the injured person must be ''oblivious to his danger,'' or ''must be in such a condition as not to appreciate it'' and this fact must be manifest to the operator of the car or he will be justified in presuming that the person will keep out of danger. The following cases so sold. Sites v. Knott, 197 Mo. 684 1 .c. 713; Boyd v. Railroad, 105 Mo. 371; Guyer v. Railroad, 174 Mo. 344 and many others. But, in this case, the motorman admits plaintiff was not looking at him and plaintiff's evidence also shows he was not, but was looking southward watching for a car from that direction. The fact that plaintiff in his mind knew that a car was coming did not prevent him from being oblivious to his *danger*. One may know that a car is on the track and is coming some distance away and yet be oblivious to the *danger* from said car, on account of having misjudged its distance, its speed, or the time it would take him to cross. If now he manifests to the motorman such obliviousness to danger, and *thereafter* the motorman has time, in the exercise of reasonable care, to avoid the injury, he must do so or his master will be liable. We have shown that there was substantial evidence tending to show that such was the case here. This being so, we cannot absolve defendant as a matter of law.

It is also contended that the court erred in allowing plaintiff's physician to testify that, in his opinion, the probabilities were that plaintiff would suffer in the future from ''dementia, some brain trouble, a possible paralysis, or a brain pressure resulting in epilepsy.'' The ground of the objection was that such

diseases were not within the scope of the pleadings, such results not being specially pleaded.

The petition alleged that "plaintiff received severe and painful wounds and injuries to his face, nose, eyes, *head*, . . . a severe and lasting injury to his nervous system and a severe and lasting nervous shock and also . . . an injury to his neck. From all of said injuries plaintiff has suffered . . . and will continue to suffer throughout his life great physical pain and mental anguish, and that all of said injuries are permanent and lasting . . . And plaintiff at all times since said injuries has suffered from severe headaches and . . . plaintiff's *mind* was and *is* affected . . . and, for a long time after said injuries, . . ..plaintiff's mind was so affected that plaintiff was not conscious of his whereabouts or what he was doing, and throughout his whole life will suffer great pain in his head . . . and will continue to suffer from nervous shock . . . and throughout his life will be rendered unable to perform labor."

The petition is thus seen to allege permanent injuries to his head, nervous system and mind. While the petition says his mind was so affected that he was not conscious of his whereabouts or of what he was doing for from four to six weeks it also says his mind *is* affected, and that he will continue to suffer from pain in the thead and from nervous shock and be unable to labor. The basis of the objection is the rule that where the plaintiff specifies his injuries he is limited by his specifications and cannot recover for injuries that do not fall within their legitimate scope, or that where general damages are alleged plaintiff cannot recover for special damages, but must plead them specially before he can be allowed to prove them. In the recent case of Cooley v. Kansas City Elevated Railway Co., 156 S. W. 54, we had occasion to consider the question now under consideration, and to

177 Mo. App. 24

refer to the cases of Gurley v. Railroad, 122 Mo. 141 and Moore v. Transit Co., 226 Mo. 689. It is not necessary to repeat here what was then said except to say that, as we understand the rule announced by the Supreme Court, it is that "all injuries which naturally result from the main or specific injury alleged may be shown without being specifically pleaded and that such natural result does not have to be a necessary result but only a usual one reasonably expected to follow from the injuries inflicted and alleged." In other words, the evidence objected to is admissible if it relates to such results of the injury pleaded "as the defendant may reasonably take notice of and expect from the general allegations of the petition." Now the allegations of the petition charged permanent injuries to the head, mind and nervous system. Certainly this would be as sufficient to give notice of a permanently injured brain as the pleading of a permanent injury to the leg and the nervous system would be to give notice of a paralyzed arm, as in the Gurley case, or as, a plea of injuries to the back, legs, kidneys and nervous system would be to give notice of loss of sexual power as in the Moore case. The answer, to which objection was made, was not the announcement of a disease arising from something different from the cause alleged or from a source foreign to the brain or mind, but was merely a specification of the various kinds of brain-and-mind troubles which would reasonably and naturally be expected to follow from a traumatic injury to the head and nervous system. For this reason the admission of said testimony was not error.

Objection is made to the giving of certain instructions and to the refusal of others.

As to plaintiff's instructions Nos. 1 and 2, there was evidence upon which to base them, as we have held in the foregoing. It was not necessary to include the element of plaintiff's negligence. The case

was submitted solely upon the issue of defendant's negligence under the humanitarian rule. When that is the fact, contributory negligence is eliminated from the case. [Johnson v. Railways, 203 Mo. 381, l. c. 414; Welland v. Railway, 144 Mo. App. 205.] Neither do the instructions conflict with each other. Said instruction No. 2 does not require the jury to find that "plaintiff was not aware of the *approach* of said car" but that he was not aware of the *dangerous proximity* of the car. It did not, therefore, require the jury to find a fact contrary to plaintiff's evidence.

As to the other points made on the instructions, we have examined them all and find that they are without merit. The foregoing disposes of all the questions of substantial merit in the case. The judgment is affirmed. All concur.

## ON MOTION FOR REHEARING.

In a motion for rehearing defendant very earnestly insists that we should hold, as matter of law, that plaintiff was guilty of such negligence, in attempting to cross the track in front of the approaching car, as to bar him of recovery without regard to the humanitarian rule. Defendant's contention is that plaintiff's knowledge that a car was coming is sufficient of itself to put him beyond the pale of the humanitarian rule. But plaintiff's knowledge of the approach of the car is not sufficient of itself to do this. Of itself, such knowledge can only render plaintiff guilty of contributory negligence, and such negligence does not prevent the operation of the humanitarian rule, if *after such negligence becomes apparent* to the motorman *there is still time* for him in the exercise of reasonable care to avoid the injury. Plaintiff's knowledge of the approach of the car could affect the humanitarian rule only in one way: That is, by such knowledge being made *apparent to the motorman.* If the motorman

knew that plaintiff was aware of the approach of the car, then the motorman had a right to presume that the plaintiff would not go from a place of safety into a place of danger. But, if the motorman had nothing to show that plaintiff knew the car was approaching, he had no right to presume that plaintiff would not go upon the track because the plaintiff was looking the other way and was steadily approaching the track giving every indication of an intention to cross, and no indication whatever that he knew the car was coming. In that situation, plaintiff was oblivious to his *danger,* and that obliviousness was apparent to the motorman. If now, *after* that obliviousness became apparent to the motorman, there was still time for him to check or stop the car, by ordinary care, it was his duty to do so under the humanitarian rule. The fact that plaintiff was mentally aware that a car was approaching would have no effect on the humanitarian rule unless the motorman knew or had reason to believe he was so aware of it. Plaintiff could have knowledge that a car was approaching and yet be oblivious to the danger of crossing the track; and unless there was something to lead the motorman to believe plaintiff had such knowledge, there was nothing to prevent the motorman from knowing that he was oblivious to the danger.

For this reason we do not think the decision herein is contrary to Reeves v. Railway, 158 S. W. 2, nor to Pope v. Railway, 242 Mo. 232, nor to Kinlen v. Railway, 216 Mo. 145. In the Pope case the plaintiff's knowledge of the approach of the train was known to the engineer. But even in that case the court says there will be liability if proper care is not exercised to stop the train after it becomes apparent that the person was going to remain in danger. In the Reeves case, the engineer had the right to assume that Mrs. Cozby would not walk in front of the train because she looked at the approaching engine, and as

said by the court "the engineer was fully warranted in supposing that she saw it and would exercise the ordinary intelligence of an adult and keep out of its way." And in the Kinlen case the court is talking about an instruction presenting a situation where one knowingly drives in front of an approaching car *when he knows he will not have time to cross in safety.*

Unless the knowledge plaintiff had of the car's approach was manifested in some way so as to lead the motorman to believe that plaintiff was not going to drive on the track, plaintiff's undisclosed knowledge could do no more than to make him guilty of contributory negligence. Now contributory negligence, however great, cannot prevent the application of the humanitarian rule. The only thing excusing a defendant from the operation of such rule is lack of time after discovery of the perilous situation to avoid the injury. If there is time to avoid the injury by ordinary care, after discovery of the peril, then a failure to use such care after such discovery will render a defendant liable no matter how gross the negligence of the other party. On this point see what LAMM, J., says in Dutcher v. Railway, 241 Mo. 137, l. c. 163, wherein he concludes thus: "It is clear that the frequent statements that contributory negligence is an absolute bar to recovery, except where the defendant's conduct has been 'reckless,' 'willful' or 'wanton,' or even grossly negligent, are not sound. No courts have in actual practice adhered to this imaginary rule; it has been explicitly overruled, and, indeed, it has been explained away or disavowed by courts which have previously stated it. Nothing more is really meant by the courts using these phrases than a want of ordinary care, after becoming actually aware of the plaintiff's peril."

The motorman agrees with plaintiff that when the car was 200 feet from the crossing the plaintiff was approaching the crossing *and looking the other way.*

It is true he says plaintiff stopped and waited until the car was only forty feet away and then whipped up and tried to cross in front of it. The question of whether this happened or not was submitted to the jury and they found plaintiff did not stop. So that the motorman had nothing to lead him to believe that plaintiff was not going into danger, but every reason to know that he was and was doing so *looking the other way.*

We think that under these circumstances there was sufficient ground for the submission to the jury of the question of defendant's liability under the humanitarian doctrine, and that our decision is not in conflict with the rules laid down by the Supreme Court. Motion for rehearing denied. All concur.