# ROENFELDT v. ST. LOUIS & SUBURBAN RAIL-WAY COMPANY, Appellant.

### Division One, March 17, 1904.

1. **PRACTICE: Verdict by Nine Jurors: Vested Right.** No one has a vested right to have his cause tried by any particular mode of procedure. The fact that an action was begun and the issues joined before the amendment to the Constitution which authorized nine of a jury in a civil case to render a verdict was adopted, does not affect the validity of a verdict subsequently rendered by nine jurors.

2. **CONTRIBUTORY NEGLIGENCE: Crossing Street Railway: Exception.** Where the plaintiff, in attempting to cross a street railway track in front of an approaching car, was guilty of negligence contributing to the collision between his wagon and the car, he can recover only when those in charge of the car saw (or, in some cases, when by the exercise of ordinary care, might have seen) his perilous position in time, with the means at hand, by the use of ordinary care, to have averted the injury.

3. ———: ———: **Time to Avert Injury: When no Wantonness Present.** But if the car could not have been so stopped, or if it was doubtful that it could be so stopped, or if the circumstances leave those in charge of the car room to judge that the wagon would clear the track before the car could reach it, there is no wantonness in the case, and nothing to relieve the plaintiff of the fatal consequences of his own contributory negligence.

4. ———: ———: ———: ———: **Mistaken Judgment.** Where the evidence shows that the car was traveling over three times as fast as the wagon, and that the car had more than four times as far to go, after the motorman saw the wagon, as the wagon had to go in order to avoid the accident, and that the driver thought that he could cross the track in safety, the motorman is not to be condemned if he thought the same.

Appeal from St. Louis County Circuit Court.—*Hon. Jno. W. McElhinney*, Judge.

REVERSED.

*McKeighan & Watts* and *Robert A. Holland, Jr.,*
for appellant. .

The court erred in refusing to give, at the close of
plaintiff's evidence and at the close of all the evidence,
an instruction in the nature of a demurrer to the evi-
dence, asked by defendant:  (a) Because there was no
evidence of any negligence on the part of defendant.
State v. Brooks, 99 Mo. 137; Feary v. Railroad, 162 Mo.
75; Erwin v. Railroad, 68 S. W. 91; Holmes v. Ledding,
69 S. W. 323.  (b) · Because the evidence shows con-
clusively that the injuries complained of by plaintiff
were directly due to his own negligence.  Payne v. Rail-
road, 136 Mo. 534; Yancey v. Railroad, 93 Mo. 435; Kel-
sey v. Railroad, 129 Mo. 369; Lenis v. Railroad, 76 Mo.
86; Culbertson v. Railroad, 140 Mo. 35; Kreis v. Rail-
road, 148 Mo. 321; Maxey v. Railroad, 113 Mo. 1.

*Wm. R. Gentry* for respondent.

The demurrer to the evidence was properly over-
ruled.  The cases cited by appellant to show that the de-
murrer should have been sustained do not apply.  The
facts in all of them are radically different from those
in the case at bar.  There is not a single case among
those cited by appellant under this heading where the
evidence showed or even tended to show that the car
or train could have been stopped after plaintiff was in
a position of danger, except the Culbertson case, and
there the preponderance of the evidence was to the effect
that it was impossible to stop the car, because plaintiff
suddenly whipped up his horse and dashed into a place
where the car could not pass him, when he could have
gone to the left and been safe.  The plaintiff was en-
titled to have the case submitted to the jury.  Schaf-
stette v. Railroad, 74 S. W. 826; Klockenbrinck v. Rail-
road, 72 S. W. 900; Morgan v. Railroad, 159 Mo. 262.

· VALLIANT, J.—Plaintiff was driving in a wagon along Twentieth street, crossing the tracks of defendant's street railroad at the intersection of Twentieth and Wash streets, when his wagon was struck by a car of defendant and he was thrown out and received injuries. This suit is to recover damages for these injuries.

The petition alleges that the defendant negligently caused its car to collide with the wagon and that the defendant's servants in charge of the car saw, or by the exercise of ordinary care could have seen, "the plaintiff as he was crossing Wash street and as he approached said track and after he drove the horses on the track, and saw or by the exercise of ordinary care could have seen the plaintiff after he was in a position of peril, and by the exercise of ordinary care could have avoided striking said wagon and injuring plaintiff after his position of peril was known to defendant by its agents and servants in charge of said car, or could by the exercise of ordinary care have been known," etc., yet they failed to exercise such care, and that failure contributed to cause the injuries of which the plaintiff complains.

The petition then sets out the city ordinance requiring that the servant of a street railroad company in charge of a car, "shall keep a vigilant watch for all vehicles and persons on foot, especially children, either on its track or moving towards it, and on the first appearance of danger to such persons or vehicles, the car shall be stopped in the shortest time and space possible," and states that the servants of the defendant on this occasion failed to perform the duty required by that ordinance and that that failure contributed to the injury complained of. ·

The answer was a general denial and a plea that the plaintiff himself was guilty of negligence which directly contributed to his injuries.

Reply, general denial.

The testimony on the part of the plaintiff tended to show as follows:

Twentieth street runs north and south, Wash street crosses it running east and west. Defendant maintains a double-track street railroad on Wash street; the north track is for defendant's west-bound cars, the south track for the cars east-bound.

The plaintiff was driving a two-horse team to a wagon loaded with barley. His course was north on Twentieth street. The grade on Twentieth street from south to north is a decline of three and three-tenths per cent for a distance beginning forty-five feet south of defendant's south track, to that track, then it is level across the two tracks, thence north it is a slight up-grade. Going west on Wash street from Nineteenth to Twentieth (as the car in question was going), there was an up-grade of one and three-tenths per cent. Twentieth street at its intersection with Wash is 36.4 feet wide from curb to curb; the sidewalk on the east side is 12 feet wide; there is a building in which is a saloon, on the northeast corner of these streets, which measures 46 feet, 9 inches, along the north line of Wash street; the distance between the two tracks is 5 feet, 9 inches, each track is 4 feet, 10 inches wide; from the south curb line on Wash street to the south rail of the south track is 10 feet, 3 inches; at the southeast corner is a two-story brick house which is set back 21 feet from the south curb. The tracks run straight on Wash street east and west.

The plaintiff was familiar with the situation, he had been driving across those tracks at that point several times a day for several months, and knew how the cars usually ran there. The account that the plaintiff himself gave of the accident was as follows: As he approached Wash street he looked to the east and saw the car coming, it was then two hundred and fifty feet away and was coming

very rapidly, thirty miles an hour, and increasing in speed until at the moment of the collision it was going sixty miles an hour. He was driving in a slow walk, not to exceed two miles an hour. When his horses' heads were about to go over the north track the car was fifty or sixty feet from him, he drove steadily along and had almost cleared the track when the car struck the hind wheels of his wagon and turned it over.

"Q. As this car came along you saw it two hundred and fifty feet away from you and you kept right along towards the track, seeing the car coming toward you? A. Yes, sir.

"Q. Why didn't you stop and let the car go by? A. I couldn't stop. I was going down hill and he was going up hill.

"Q. And you thought the car would stop, and, therefore, you took your chances? A. Yes, sir.

"Q. Was the car stopping? A. No, sir.

"Q. You thought it might stop? A. Yes, sir.

"Q. And still you say the car was coming faster and faster? A. Yes, sir.

"Q. And yet you crossed in front of it? A. Yes, sir.

"Q. And when your horses' heads entered on that west-bound track the car was fifty or sixty feet away? A. Yes, sir.

"Q. When you got to this first track, when you saw that this car was coming faster and faster, why didn't you stop and let it go by—not drive right in front of it? A. I couldn't stop it any more.

"Q. Why didn't you drive it in such a way that when you saw a car coming you could stop it? A. There was no brake on the wagon.

"Q. Why didn't you drive your wagon so that when you saw a car you could stop? A. I couldn't stop it any more.

"Q. In other words, whenever you drove down there you had had to take your chances? A. I'd been

across if they had slacked up anyways, but they still came faster.

"Q.   When you got down here to this crossing and saw this car you could have stopped your wagon then? A.   It was near the crossing when I saw it.

"Q.   When you got near the crossing you could have stopped it then?   A.   Yes, sir.

"Q.   When you saw this car coming sixty miles an hour why didn't you stop?   A.   I thought I could get across easy enough.   I could have if it slowed up.

"Q.   You thought you could get across?   A.   Yes, sir.

"Q.   Did you have a brake for that wagon?   A. No, sir.

"Q.   When you got to the first track the grade is even?   A.   Yes, the tracks are about level.

"Q.   And when you got across the tracks the grade goes up?   A.   Yes, sir."

The testimony of the other witnesses in plaintiff's behalf was to the effect that the car was going at the rate of nine or ten miles an hour.   It was admitted by the parties that it was lawful for defendant to run its car at a rate not to exceed ten miles an hour; the testimony for defendant also was that the car was running at the rate of nine or ten miles an hour, and that that was the usual speed of defendant's cars in that part of the city.

The plaintiff's witnesses differed in their several estimates as to the distance the car was from the point of contact when the horses of plaintiff stepped on the north track, the estimates ranging from fifty to a hundred and eight feet.

Nathan Daly saw the collision from the northwest corner of the streets.   He said that when the horses reached the south crossing, that is, the crossway from the southeast to the northwest corner, the car was at Nineteenth street, and when the horses reached the north track the car was thirty-five feet east of the east

crossing. He also said that at that time there were two men on the front platform, one the motorman, and the other a man who was being taught to be a motorman; when he first saw them the motorman was standing behind the one who was being instructed, and when the car got within thirty-five feet of the east crossing the front man turned around and the two began talking and neither looked to the front.

John A. Long who was a passenger in the car, and was noticing the wagon, estimated that at the moment the plaintiff started to drive over the south track the car was two hundred and fifty feet distant; when the horses stepped on the north track the car was fifty or seventy-five feet away. "Q. Don't you know that you felt when the horses went on the track that there would be a collision? A. Most decidedly; we were all expecting it. Q. You were all expecting it as soon as you saw the horses enter on the track? A. As soon as we saw the horses enter on the track and the car coming at that rate. Q. You knew when the horses went on the track that there would be a collision? A. Yes, sir; certainly at the rate the car was going."

Stahl was standing in the saloon and witnessed the accident. According to his testimony the horses went upon the north track just as the car had passed the east end of the saloon.

Hackett was standing on the northeast corner of the streets, was aiming to cross on Wash street, but seeing the car approaching waited for it to pass. He said that when he saw the plaintiff approach the crossing from the other side the car was about 200 feet distant, and when the horses were about to step on the north track the car was 108 feet away. He felt sure of this distance, because, after the accident, thinking he might be called to testify he measured the distance by stepping.

Sanders witnessed the accident from inside the house on the northwest corner; he estimated that when the horses were on the north track the car was twenty

feet east of the crossing.  The car after striking the wagon stopped in Twentieth street.

Speckmann saw the accident from a point on the northeast corner and was of the opinion that when the plaintiff reached the south crossing of Wash street the car was 250 feet away, and when the horses' feet got on the north track it was 100 feet away.

Whelan, who was the conductor of the car but was plaintiff's witness, testified that the car approached Twentieth street at its usual rate about ten miles an hour; that he was standing on the rear platform; that there were sixty-four or sixty-five passengers in the car; that about midway between Nineteenth and Twentieth he heard the gong sound and felt the reverse applied; he then looked out on the north side and saw the wagon crossing the track.

Plaintiff's testimony also tended to show that a car under the given conditions going at the rate of nine or ten miles an hour could be stopped by the reverse in forty to fifty feet; and by the brake in sixty to seventy-five feet.  If it was going faster the distance in which it could be stopped would be proportionately greater, at twelve miles it could be stopped by the reverse in seventy-five feet, at fifteen, one hundred feet, etc., and by use of the brake a proportionately longer space.

Plaintiff also introduced in evidence the city ordinance pleaded in the petition and evidence that the defendant had accepted and agreed to be bound by it.

On the part of defendant, the testimony tended to show:

That in addition to the regular motorman in charge of the car was a man named Black who had served as motorman for a company in Illinois, but was being instructed in regard to the streets and grades, with a view to being qualified to take charge of a car on this line; he had been thus engaged six days and was ready to take a car.  When the car was about 100 feet east of

Twentieth street the plaintiff was driving slowly towards the tracks and Black sounded the gong.  As the team approached the north track, and before entering it, the car was thirty-five or forty feet distant; Black then applied the brakes and the regular motorman reversed the current, the car slid against the wagon and stopped just where it struck it.  The car was about 35 feet long and weighed fourteen or fifteen tons.  There were about sixty passengers aboard.  Some of the passengers testified that they heard the violent sounding of the gong, felt the effect of the brakes, and the reverse applied which "threw the people every way;" that the wheels slid on the rails and there was a perceptible slacking of the speed before the car came in contact with the wagon.  The car under the conditions named could not have been stopped in a shorter space than seventy-five or eighty-five feet.

At the close of the plaintiff's evidence, and again at the close of all the evidence, the defendant asked an instruction in the nature of a demurrer to the evidence, which the court refused and exceptions were duly preserved.

The cause was submitted to the jury under instructions to the effect that if the jury should find from the evidence that if the motorman had kept a vigilant watch for vehicles he would have seen the horses and wagon on the track in danger of being struck by the car, and that if after so seeing the horses and seeing the plaintiff in that position of peril the motorman could, by stopping the car in the shortest time and space  possible under the circumstances, have averted the accident, yet failed to do so, the verdict should be for the plaintiff, provided the jury should also find that the plaintiff was himself at the time exercising ordinary care; and that even though the jury should find that the plaintiff was guilty of negligence in driving on the railroad track as he did, yet, if the motorman saw the plaintiff's perilous condition, or by the exercise of ordinary care would

have seen it, and knew or by the exercise of ordinary care would have known that the plaintiff was in danger of being injured unless the car was stopped or slackened in speed, yet the motorman failed to stop or slacken the speed of the car in the shortest time and space possible, still the defendant was liable if the jury also believed from the evidence that the defendant had accepted and agreed to be bound by the ordinance in evidence.

The court of its own motion instructed the jury that nine or more of their number might render a verdict.

We deem it unnecessary to set out the instructions given for defendant or those refused which defendant requested.

There was a verdict for plaintiff by eleven of the jurors for $5,000. When the court came to consider the defendant's motion for a new trial it announced that the motion would be sustained unless the plaintiff should remit $1,665 of the verdict. The plaintiff entered the remittitur, the motion was then overruled, and judgment entered for the plaintiff for $3,335, from which the defendant appeals.

I. The defendant in its motion for a new trial raised the question of the constitutionality of the law authorizing nine of a jury in a civil case to render a verdict, and as the appeal was taken before this court had settled that question the appeal was properly taken to this court. Since the decision in Gabbert v. Railroad, 171 Mo. 84, that is no longer a question in this State, but as it was a question when this appeal was taken the court retains its jurisdiction.

The only new idea in connection with that subject that is advanced in the brief of counsel in this case is, that as this action was begun, and the issues joined, prior to the adoption of the constitutional amendment, the cause could be tried only under the mode of pro-

cedure existing when the suit was brought or the issues were joined, and therefore the constitutional amendment authorizing nine of the jury to render a verdict does not apply to this case.

No one has a vested right to have his cause tried by any particular mode of procedure. The State has the sovereign power to prescribe the mode of trying causes in its courts and to alter the same from time to time as it may see fit. If the mode is prescribed by an act of the General Assembly it may be changed by an act of the General Assembly; if it is prescribed by the Constitution it may be changed by the power which makes the Constitution.

The learned counsel for appellant have advanced no argument in support of the proposition and for that reason we are satisfied there is no argument to support it.

II. As the plaintiff approached Wash street he looked towards the east and saw this car coming; it was then, according to his estimate, 250 feet distant. The house on the southeast corner was twenty-one feet from the south curb; this gave the plaintiff an unobstructed view of the approaching car. From a point forty-five feet south of the south track to that track, there was a down-grade of three per cent, then the road was level across the two tracks. When asked why he did not stop when he saw the car coming he said that he had no brake on his wagon and for that reason could not stop. A grade of three per cent is not a precipitous declivity, and the course of the plaintiff shows that the grade had no influence on his movement; he said that he was going in a slow walk, not over three miles an hour. If he was able to travel at that slow gait without a brake, down the grade, he could have stopped his horses when he came to the level, or at least he could have directed their course to the right or the left. He said that when he came to the crossing he could have stopped, but he made

no effort to do so, he thought he could get across and he drove on. He was guilty of negligence that, at least, contributed to the accident.

But the theory of the plaintiff's case, as shown in his petition, his evidence and the argument in his brief, is that, admitting that the plaintiff through his own negligence put himself in a position of peril, yet the case falls within the exception to the rule that one can not recover for injuries received in consequence of his own contributory negligence. The exception to the rule is that when the defendant sees (or in some cases when by the exercise of ordinary care he might see) the plaintiff in a position of peril and, with the means then at hand, is able, by the exercise of ordinary care, to avert the injury, but neglects to do so, he is liable. Under those circumstances the defendant is adjudged guilty of such reckless or wanton disregard of human life or limb that he is not exonerated by showing that the plaintiff was also negligent.

Is there anything in the evidence in this case to show such a reckless or wanton disregard of duty on the part of the defendant's servants in charge of this car? Is there any evidence tending to show that after the motorman or motormen saw the plaintiff in peril they could have stopped the car in time to avert the catastrophe?

There is no question about the motormen seeing the plaintiff; they both testified that they saw him when the car was a hundred feet east of Twentieth street, and that he was driving, as he himself said, slowly towards the tracks. He was in plain view to the motormen and the car was in plain view to him. The mortormen said they rang the gong violently, but that is immaterial; the plaintiff did not need the gong to call his attention to the approaching car, for he saw it, and noticed that it was coming very rapidly, yet he drove slowly on. He says that he did not stop because he had no brake on his wagon. If that is true, it implies that if he had had

a brake he would have stopped. This he said apparently in excuse for doing an imprudent act. The situation was such as would have suggested to any man of ordinary prudence to stop until the rapidly moving car had passed; just as the plaintiff's witness Hackett did. Mr. Long a witness for plaintiff who was a passenger on the car and was a close observer of the situation said that as soon as he saw the horses enter on the track "we all expected" the collision. It was obvious to all that the collision would occur if the man did not stop. Under those circumstances the motormen had a right to presume that the plaintiff would stop. If there was any truth in the statement that the plaintiff could not stop because there was no brake on the wagon, that fact was not known to the motormen; there was nothing to indicate to them that the plaintiff did not have control of his wagon, and they had a right to act on the presumption that he would do what common prudence dictated for his own safety.

But the plaintiff's argument is that after the horses got on the north track and plaintiff's peril was then obvious, the motormen could have stopped the car if they had used the effort that the ordinance required.

Appellant meets this argument by saying that if the car was going as fast as the plaintiff says it was at thirty miles an hour when he first saw it, and increased to sixty miles an hour it was impossible, according to all the evidence, to have stopped it in time to have prevented the collision. That is so; but the car was not going sixty or even thirty miles an hour, it was going between nine and ten miles an hour; all the witnesses, except the plaintiff himself, those for defendant as well as for plaintiff, say the rate was nine or ten miles an hour.

Plaintiff's witnesses do not agree as to the distance the car was from the point of collision when the horses entered the north track. Mr. Long said it was from fifty to seventy-five feet and he said that when the

horses got on the track, the car was then going so fast that the collision was inevitable. The car was full of passengers; the law makes their safety the motormen's first care. One of plaintiff's witnesses who was on the car says that before it reached Twentieth street the shock caused by the application of the brakes or the reverse of the motor was felt, and that the wheels slid on the rails. This is plaintiff's testimony, and from it, or in the face of it, the jury were authorized under the instructions to find that the defendant was liable notwithstanding the plaintiff's own negligence. That was error.

The plaintiff's witnesses on this point put him in this situation: If he selects the shortest distance given by any of them, his expert testimony shows that the car could not have stopped in time within that space; if he takes the average or medium estimate, the most favorable claim he can make is that the possibility of stopping in time was doubtful (which falls far short of showing a case of reckless or wanton misconduct on the part of the motormen), and finally if he takes the longest distance it leaves the motormen room to judge that the wagon would clear the track before the car could reach it.

Hackett says the distance was 108 feet, and the learned counsel for respondent thinks that is the most reliable estimate. The length of the plaintiff's outfit, horses and wagon, is not given, but it would perhaps not be assuming too much if we should say it was not more than twenty-five feet. So that after the horses' front feet were on the north track they had not more than twenty-five feet to travel to clear the track, and while they were going that distance the car according to Hackett had to go 108 feet. The evidence was the horses were going three miles an hour and the car between nine and ten. Thus while the car was going three times as fast as the horses it had more than three times the distance to travel. The plaintiff seeing the car and

the speed with which it was coming judged for himself that he could clear the track before the car reached him. If that was a reasonable judgment for the plaintiff how can he condemn the motorman if he, viewing the same situation, should reach the same conclusion?

The plaintiff was guilty of negligence which contributed to his injury and there is nothing in the evidence tending to show that the motorman could have stopped the car in time to have prevented the collision after the plaintiff had put himself in the position of peril.

The defendant's instruction in the nature of a demurrer to the evidence should have been given.

The judgment is reversed.

All concur.