CHARLES L. PERRY, RESPONDENT, v. FRED L. FLEMING AND FRANCIS M. WILSON, RECEIVERS, KANSAS CITY RAILWAYS COMPANY, APPELLANTS.[*]

Kansas City Court of Appeals. June 6, 1927.

1072

*Corpus Juris-Cyc References: Appeal and Error, 4CJ, p. 709, n. 26; Street Railroads, 36Cyc, p. 1565, n. 3; p. 1631, n. 75; p. 1636, n. 96; p. 1643, n. 27; Trial, 38Cyc p. 1787, n. 98.

*Charles L. Carr, Charles N. Sadler, John R. Moberly, E. E. Ball* and *Harding, Murphy & Tucker* for appellants.

*Gamble, Trusty & Pugh* for respondent.

BLAND, J.—This is an action for damages for personal injuries. Plaintiff recovered a verdict and judgment in the sum of $12,000 but to avoid the granting of a new trial by the court he remitted the sum of $4500, leaving a judgment in the sum of $7500. Defendants have appealed.

The facts show that on the 14th day of January, 1924, plaintiff was driving west on Ninth street in Kansas City, Missouri, where he came into collision with an eastbound street car at a point on said street between Welch and Norton avenues in said city. Ninth street is thirty-six feet in width; it runs east and west and is intersected by the following north and south streets from east to west in the order in which they are mentioned: Spruce, Welch, Norton, Myrtle and Cleveland. There was a double street car track on Ninth street, eastbound cars using the south track and westbound cars the north. Plaintiff was thoroughly familiar with 'these streets and the conditions present as his office and residence were located in the vicinity of where he was injured. Plaintiff testified that there had been a snowfall on the 10th or 11th of January and that Ninth street was covered with snow and sleet; that the street was more or less uneven and rough and it had just begun to thaw at the time he was injured. There was evidence that the rails of the track had sunk so that they were level with the pavement and were even below the level of the street in places. Plaintiff further testified that street cars and vehicles had been using the street since the snow and had caused ruts with sides of packed snow and ice to be made along the rails of the street

car tracks; some of the witnesses stated that the rut along the north rail of the eastbound track was as much as eight inches deep; that the street was higher in the center, sloping to the north and to the south.

Plaintiff testified that at about noon of the day in question he entered his Ford sedan a short distance east of Spruce on Ninth street, intending to drive west toward his home; that there was an automobile truck on the north side of Ninth street about fifty feet west of Spruce which was parked diagonally against the north curb of Ninth street; that this truck did not obstruct westbound street cars; that he could stand at the junction of Ninth street and Spruce and see a street car at Ninth and Cleveland, four blocks west; that when he was crossing Spruce avenue he noticed a street car between Myrtle and Morton avenues, two and a-half blocks away; that it was down grade from Myrtle to Welch but practically level between Welch and Spruce; that at that time he was in low gear and proceeding at the rate of four or five miles per hour; that he was driving north of the north rail of the westbound track; that seeing the truck in front of him he turned toward the south to go around it; that when he so turned he started to skid and his left front and rear wheels slid into the rut along the north rail of the eastbound track; that both wheels of his car went into the rut at the same time and about fifteen or twenty feet west of the truck; that at the time his car slid into the rut he "looked up" and saw the car "just west" of Norton avenues, about a block away, or, possibly, a block and a·half. There was other testimony tending to show that the car stopped at a safety stop and let off passengers at a point immediately west of Norton. Plaintiff testified that at this time he could not tell whether the car was moving or was stopped but he continued forward in the rut; that at the time he dropped into the rut he was going at the rate of from four to six miles an hour and continued to pick up speed so that he reached a speed, while both of his wheels were in the rut, of six or eight miles per hour.

Plaintiff further testified that while going forward in the rut "he kept trying to get those wheels out of the rut"—"kept trying to get out—" "I would get the front wheel on the rail and it would drop back, and I would get it up again and it would do the same thing— get the front wheel on the rail and drop back. I had proceeded that way for some time. Every time I would get it on the front rail it would drop back into the rut; the front wheel;" that he succeeded in getting the front wheel up out of the rut three or four times but it would drop back and finally after he had driven in this manner from forty to seventy feet he succeeded in getting his front wheel out of the rut and the front end of his automobile toward the northwest; that he did not look again from the time he slid into the rut until his front wheel got out of it; that he then glanced up and saw the street

car forty or fifty feet away; that at that time the street car "seemed to be running;" that he continued in his effort to get his left rear wheel out of the rut, without success, by guiding his car to the northwest; and he continued to increase his speed so that he was going eight to ten miles an hour, running about thirty or forty feet when he collided with the street car; that the collision occurred about half way between Welch and Spruce, "a little closer" to Welch than Spruce. At one place in his testimony plaintiff stated that the point of the collision was 250 feet west of Spruce and that his best judgment was that Spruce and Welch were 500 feet apart but that he could not be sure of this.

Plaintiff testified that he had not "noticed anything about the speed of the car" until he got his left front wheel out of the rut and had formed no opinion as to the danger; that during the time he was running the last thirty or forty feet he thought that he would get out of the rut; that he did not see the street car during all of the time his front wheel was out of the rut; that "I was more concerned with getting out of that rut;" that he continued on because he "figured on" getting into the clear. There was evidence that the street car gave no signal of its approach. It was a clear day and there was nothing to obstruct the view of the motorman or plaintiff.

Plaintiff's witness, Cox, testified that he was standing on a truck at the southwest corner of Ninth street and Spruce, facing west; that the first he saw of the occurrence was after the left wheels of plaintiff's car went into the rut; that when he first saw the situation the street car was at Norton; that the street car continued forward at the rate of twenty-five or thirty miles an hour and went about 150 to 175 feet after the collision before stopping; that when the street car stopped its front vestibule was "just past the west side of Spruce;" that he saw plaintiff get his front wheel out of the rut and that plaintiff traveled from seventy-five to 100 feet after that time before the street car hit plaintiff. The witness had been a motorman and testified that a street car, at the time and place in question, going at the rate of twenty-five to thirty miles per hour, could have been stopped in 100 to 125 feet; that when the street car reached Welch avenue and got upon level ground it could have been stopped in fifty or fifty-five feet; that the automobile ran 230 to 265 feet from the first time he saw it in the rut to the point of collision. On cross-examination the witness stated that plaintiff drove seventy-five feet with the rear wheel in the rut after the front wheel cleared the rut; that plaintiff's automobile was running at the rate of ten to twelve miles an hour during the time that he saw it.

Plaintiff's witness, Birgin, testified that he was about 125 feet east of Spruce, facing west, at the time in question and that he saw the Ford sedan in the middle of the street "and it seemed to be making

an effort to get to the right side of the street and having very poor luck with it;" that this continued until the collision.; that the Ford sedan was making a "wobbling movement;" that just before the collision the front end of the Ford "headed out toward the right side of the street;" that the left wheels of the Ford were in a rut along one of the eastbound street car rails.

Plaintiff's witness, Martin, testified that he was a passenger upon the car that collided with the automobile; that he lived on Ninth street, the fourth door east of Norton; that he alighted from the car at Norton "on the west side of the street at the safety stop there." A photograph, which the witness identified, shows that the safety stop, located at a pole, was only a few feet west of the intersection of Norton with Ninth street. The witness further testified that after he alighted from the street car he started to his home toward the northeast, the car proceeding on ahead of the witness. The witness testified that the car—

". . . dropped down the hill there, and when I got to a point about the middle of the street, I saw the automobile come out from around the truck sitting out there in front of the furniture store at Spruce, and he swung around this truck. As he did that, he skidded over into the eastbound track, and he went flopping like this (indicating). I first thought he broke his steering gear.

"MR. SADLER: I object to that—what he thought and ask that it be stricken out.

"MR. GAMBLE: Yes, strike that out.

"A. I saw it wobble."

That the collision occurred about 175 feet west of Spruce; he was asked—

"Q. How long did this automobile continue these erratic movements you have described here before this collision occurred? A. All the way from this corner (indicating). This automobile was standing in front of the furniture store. He kept doing that until he hit the car.

"Q. From a point where this automobile, or truck, or whatever it was, was standing behind the furniture store on the west side of Spruce where he skidded into the track, that same movement continued until—A. He was flopping like he was trying to—

"MR. SADLER (interrupting): We object to what he was trying to do.

"Q. He was flopping? A. Yes. . . . There was snow on the ground and this track here at this point between Spruce and where this accident was, there was some ruts along the rail probably six or seven inches deep in where the rails were; some of the snow was wedged up on the outside and the wheels made a rut there.

"Q. Where were the left wheels of this automobile of which you have spoken as it was flopping—use your own language—with reference to the rut along the north rail of the eastbound track? A. The wheels were in this rut.

"Q. The left wheels of the automobile? A. Coming west, yes."

The witness further testified that the street car proceeded on down the hill at the rate of speed of between thirty-five and forty miles per hour and did not slow up at any time before the collision and proceeded on to Spruce avenue before it stopped. On cross-examination the witness stated that he saw plaintiff's automobile come out from behind the truck and that he plainly saw the automobile skid upon the track. He testified—

"Q. Just slid right over there at that time? A. Yes, sir.

"Q. And stayed right in there and flopped up and down while it was going? A. The front wheels jumped back and in again.

"Q. Keep jumping out and back in again all the way until they hit? A. Yes, that was a very short time."

He testified that plaintiff's automobile was going fifteen or twenty miles an hour from the time he saw it until the collision. Plaintiff's witness, Stewart, testified that plaintiff's automobile after the collision was something like 150 to 200 feet west of Spruce.

The motorman, testifying for defendant, stated that the street car stopped at Norton and that he observed the slow sign at Welch; that he saw plaintiff's car at Spruce on the north side of the street; that the automobile was advancing at the rate of about twenty-five miles an hour; that he saw the automobile pass the truck just west of Spruce and that it continued coming straight forward on the north rail of the westbound track; that it did not change its course until it got within twenty feet of the street car, at which time it suddenly turned and crashed into the front end of the latter; that the witness immediately applied the emergency brake; that the collision knocked the witness down but he stopped the car within 175 feet; that his car from the time it left Welch to the point of collision, was proceeding at the rate of ten miles per hour and that it could have been stopped with safety to the passengers, going at the rate of eight or ten miles an hour at the place in question in forty-four feet; that going at the rate of twenty miles it would require 200 feet in which to stop, the rails being slick; that going at the rate of thirty miles an hour it would require almost a block. He further testified that the surface of the street where the street car was running was level at the place in controversy and not sunken as far as he knew; that the street along the north rail was in good condition; that he noticed no rut formed along the north rail. Defendant's evidence tended to show that it was 354 feet and six inches from Norton to Welch.

In rebuttal plaintiff showed that the street car could have been stopped under the circumstances going down the hill between Norton and Welch at eight or ten miles an hour in forty-two to forty-five feet, even on slick rails. There was an ordinance pleaded and introduced in evidence providing that all street cars should be run "at all times and places at a reasonable rate of speed, under the particular circumstances" and not to exceed twelve miles per hour over and across any street in the city.

The petition pleads a number of charges of negligence on the part of defendants, one being based upon the humanitarian doctrine. It was upon this doctrine that the case was submitted to the jury. Defendants insist that their instruction in the nature of a demurrer to the evidence should have been given. This contention is based largely upon the claim that plaintiff was injured through his own reckless and wanton conduct in remaining in the automobile when he saw the car approaching, instead of stopping his automobile and getting out of it, and, further, that there was nothing present to indicate to the motorman that plaintiff and his automobile were not going to get out of the way of the street car. Plaintiff did not testify that he could have gotten out of his car and have reached a place of safety and there is no testimony in the record tending to show as to how long it would have required plaintiff to stop his car and get out of the same and remove to a point where he would not be in danger from the wreck that would inevitably be caused if the two vehicles proceeded forward to a collision. We think this is an important matter and it is by no means evident that plaintiff exercised even poor judgment in remaining in the automobile and attempting to get it out of danger rather than stopping it and attempting to reach a place of safety. But, as both plaintiff and defendants assume in their briefs that plaintiff did have time to stop his automobile and alight therefrom and remove to a place of safety, we will dispose of the case on the theory adopted by the parties.

However, as to plaintiff's conduct in this regard, it is our opinion that it does not prevent him from recovering on the humanitarian doctrine. Of course, it has always been held that contributory negligence is no defense when this doctrine is brought into play and, in view of the law laid down in the case of Banks v. Morris & Co., 257 S. W. 482, it is immaterial as to how plaintiff got into a position of peril, whether through his own negligence "or through his sheer hardihood or recklessness." As was stated in Zumwalt v. Chicago & A. R. Co., 266 S. W. 717, 724, 725—

". . . we have recently held *in banc* that, even if plaintiff, out of sheer hardihood or recklessness, placed himself in a position of peril, he is not outside the pale and protection of the humanity doc-

trine, which plaintiff invokes in this case. The test is, without regard to how he came in peril (unless, perhaps, where he intended to commit suicide or willfully injure himself) did defendant's servants see, or could they by due care have seen, him in such peril and negligently failed to avoid injuring him? If so, defendant is liable. [Banks v. Morris & Co. (Mo. Sup.), 257 S. W. 482, and cases cited.]''

We need not say whether plaintiff could have recovered under the humanitarian doctrine had he wilfully or intentionally proceeded on until he collided with the street car, having ample opportunity to leave his automobile and to reach a place of safety, for the reason that there is evidence from which the jury could find that he was making a desperate effort to turn his automobile out of the rut at all times up to the point of collision and did not purposely collide with the street car. The jury was not required to find that plaintiff brought about his injury intentionally. Even before the Banks case, it was held that plaintiff was not deprived of the right to recover under the humanitarian doctrine because he did not get out of his wagon when his horse balked upon the car track in front of an approaching street car but instead of jumping remained in the wagon in order to get his horse and wagon from in front of it. [See Meyers v. St. Louis Transit Co., 99 Mo. App. 363.] In that case, l. c. 372, the court said—

''Plaintiff knew that it was the duty of the motorman to keep a vigilant watch for persons and vehicles upon the track; knew that his situation was seen by the motorman; knew that it was the duty of the motorman to stop his car to avoid a collision; knew that he had had time and space in which to stop, if running at a lawful speed, and had a right to assume that he would observe the ordinance and the dictates of humanity by stopping his car, which if he had done, there would have been no collision and injury. In such circumstances, it seems to us, it would be monstrous to hold that plaintiff, by remaining in his wagon when he might have gotten out, was guilty of such contributory negligence as to preclude his right of recovery.''

We think the only serious point in the case in reference to the demurrer to the evidence is whether the motorman was required to stop the street car under the circumstances; in other words, whether plaintiff was in a position of peril and that such condition was brought home to the motorman. Of course, plaintiff was not in a position of peril unless the danger of a collision was certain. As was stated in Stewart v. Mo. Pac. Ry. Co., 308 Mo. 383, 389—''It is not a contingent danger to a person in peril which brings into operation the humanitarian rule, but a certain danger.''

Peril as the word is used in the humanitarian doctrine, means something more than the bare possibility of injury occurring. [State ex rel. v. Trimble, 253 S. W. 1014.] To our mind there is no question

but that plaintiff was in peril (if the street car proceeded forward) during at least a part of the time that he was unable to get the wheels of his automobile out of the rut, and defendants in their offered instruction No. 13 seem to concede that there was evidence that he was in a position of peril even before he got upon the track. (We will hereinafter quote from this instruction.)

The evidence is very conflicting as to the distance in which plaintiff traveled in the rut. It is not for this court to attempt to harmonize this testimony but the jury was at liberty to take all of the evidence in its most favorable light to plaintiff. As far as plaintiff's peril being brought home to the motorman is concerned, we think there is room for the jury to have found that the peril was apparent to the motorman in time for him to have stopped the car and prevented the injury. Taking the evidence in its most favorable light to plaintiff, the street car could have been stopped in forty-two feet after the motorman discovered plaintiff in a position of peril. There was evidence tending to show that the two south wheels of plaintiff's automobile were caught in a rut in front of the moving street car; that although plaintiff was attempting to get out of the rut, his efforts were entirely unsuccessful, that he would get up on the side of the rut with his front wheel and then slip back; that the presence of the rut and what plaintiff was attempting to do, were at all times seen by the motorman or should have been seen by him, and that it was apparent to the motorman that plaintiff was not going to stop his automobile, for plaintiff's speed was increasing all the time, and that if plaintiff did not succeed in getting out of the rut, a collision would be inevitable.

There may have been a time when plaintiff first got into the rut, or for a short period thereafter, that the motorman would have been justified in thinking that plaintiff would get out of the rut but after plaintiff continued to attempt it without success, the jury could have found that the motorman could have seen and realized that plaintiff was not able to accomplish his purpose. It was for the jury to say whether the motorman was justified in proceeding farther without making an effort to stop his car, and at what time the motorman was required to act, under the testimony taken in its most favorable light to plaintiff. There was evidence tending to show that plaintiff proceeded as much as 200 feet before the collision with either one or both wheels of his automobile caught in a rut, going at a very slow rate of speed. As plaintiff testified that he attempted unsuccessfully to get out of the rut immediately after getting into it, the jury would have been justified in finding that plaintiff was in a position of peril and that this condition was brought home to the motorman almost immediately after the wheels of plaintiff's automobile got caught in the rut. There was evidence that plaintiff ran seventy-five

or 100 feet after his front wheel cleared the rut. So, if he ran 200 feet between the time he went into the rut to the point of collision, he moved from 100 to 125 feet with both wheels in the rut, his car all the time wobbling and the left front wheel climbing the rut and falling back again. It was within the province of the jury to say that the motorman saw or could have seen this action of plaintiff's automobile, and in view of plaintiff's repeated attempts to get the automobile clear of the rut without success, the motorman should have concluded that plaintiff was not going to clear the rut entirely and therefore was in a position of peril even before he got his front wheel out. The motorman had 100 feet in which to stop his car after plaintiff cleared his front wheel and he could have stopped it in forty-two feet.

Of course, if it were plaintiff's intention to proceed forward at all hazards in an effort to clear his automobile entirely, then stopping the street car would have been of no avail for it is extremely speculative as to whether plaintiff would have cleared the rut entirely even had the street car stopped at a point further west from the place of collision. However, we may presume that it was not the intention of plaintiff to commit suicide and, therefore, that he would have stopped his automobile had the street car stopped and plaintiff had seen that he was going to collide with it should he continue to proceed forward. It was quite a different matter for plaintiff to stop and alight from his automobile and attempt to get out of the way of a collision between it and a rapidly moving street car than it would have been for him to stop before he reached a stationary street car. It must be borne in mind that plaintiff could have stopped his automobile in a few feet and it is reasonable to suppose that he would have stopped it rather than run into a stationary street car.

It is claimed by defendants that the rut in question was vastly "over-estimated" and that the evidence shows that the condition of ruts and snow was general all over the city; that there was no difference between the appearance of plaintiff's automobile bumping along the street than of other automobiles which must have been doing the same thing over rough bumps and drifts of snow all over the city; that the motorman had every reason to believe that plaintiff would get off the track.

We have set out the testimony in considerable detail as to the appearance of the automobile "wobbling" along on the street car track and we think that the jury could have said that the appearance of plaintiff's automobile as shown by the evidence should have indicated to any one in the motorman's place that the automobile was not proceeding along the street in an ordinary way, even in view of the general condition of snow and ice over the city. However this

may be, undoubtedly the motorman could have seen what the witness Martin saw. Martin's testimony was that he saw the car get into the rut, saw the efforts of plaintiff to get out of it and saw when he finally succeeded in getting his front wheel out. In other words, Martin saw the whole proceeding. As before stated, what he saw, the motorman could have seen. There was nothing to indicate that plaintiff would not likely proceed forward as his conduct fully disclosed that he intended to proceed forward as the speed of his automobile was increasing all the time.

A great many cases under the humanitarian doctrine have been cited by the defendants, most of them having to do with conditions where there was nothing to prevent plaintiff from stopping or getting out of the way and nothing to indicate that he was not going to do so. Most of them deal with situations where the plaintiff was either oblivious to the danger or in a position where he could not extricate himself; but these are not the only two instances where plaintiff is entitled to recover under the humanitarian doctrine. The formula for recovery under this theory is laid down in the Banks case, l. c. 484, as follows:

" '(1) Plaintiff was in a position of peril; (2) defendant had notice thereof (if it was the duty of defendant to have been on the lookout, constructive notice suffices); (3) defendant after receiving such notice had the present ability, with the means at hand, to have averted the impending injury without injury to himself or others; (4) he failed to exercise ordinary care to avert such impending injury; and (5) by reason thereof plaintiff was injured."

As was said in the case of Tuck v. Ry. Co., 217 Mo. App. 442, 450—

"In the Banks case, supra, the atmosphere has been cleared on the question of the necessity to plead and prove that the deceased was oblivious to his danger and it is there held by our Supreme Court that there may be instances in which a party is aware of his danger and may even remain in a place of danger when he could get away from it and still recover under the humanitarian rule."

The case of Meyers v. St. Louis Transit Co., supra, was one where there was neither inability on the part of plaintiff to extricate himself or obliviousness on his part. In the case at bar the only feature that appears which prevents us from holding that plaintiff was not in a position from which he could not extricate himself, was that he had the ability to stop his automobile and get out of the way of danger. In all other respects the case presents a perfect situation of inextricability.

Defendants insist that plaintiff testified that he thought he would be able to get his wheels out of the rut and hence his automobile from out of the sphere of danger. It is true that plaintiff testified that *after* he got his front wheel out he thought this. This may have been

based upon the fact that he had succeeded in getting his front wheel out and therefore had a better chance of turning his car to the northwest to extricate the rear wheel. There is no evidence of what plaintiff "thought" before he got his front wheel out but we may assume from his conduct in proceeding forward, making strenuous efforts to extricate his wheels from the rut, that he thought at all times he would be able to clear the rut. It is contended in this connection that if plaintiff thought he was going to get off the track, then he should not blame the motorman for so thinking. But this does not take into consideration that one may be negligent in "thinking" as well as in action (of course, the two are very closely related) and if the motorman realized that plaintiff was not going to get out of the rut after he had made unsuccessful attempts to do so, in other words, saw plaintiff's negligent conduct, if any, then because plaintiff was negligent, the motorman is not excused. Of course, if plaintiff was negligent in continuing to "think" he could clear the rut, his negligence continued right up to a time when it was too late to avert the collision and defendant strenuously contends that he cannot recover even under the humanitarian doctrine if this is so. There is no merit in this contention. [See Zumwalt v. C. & A. R. Co., supra, l. c. 724, 725.]

We have examined the case of Roenfeldt v. St. L. & Sub. Ry. Co., 180 Mo. 554, in which the Supreme Court uses language that seems, upon a casual examination, to sustain defendants' contention that if plaintiff thought he could get out of the rut in time to avoid danger, he cannot condemn the motorman for thinking the same thing. In that case, l. c. 567, 568, the court said—

". . . The plaintiff seeing the car and the speed with which it was coming judged for himself that he could clear the track before the car reached him. If that was a reasonable judgment for the plaintiff how can he condemn the motorman if he, viewing the same situation, should reach the same conclusion."

The facts in that case were entirely different from those in the case at bar. Upon an examination of the whole evidence in that case the court found and held that plaintiff was not entitled to recover. It was upon this that the court placed its decision and not what was remarked in the quotation supra, which was merely said arguendo. In fact, the court when it used this language had already held that "while the car was going three times as fast as the horses, it had more than three times the distance to travel" thus showing under the doctrine of "wantonness" then in vogue (see Murphy v. Railroad, 228 Mo. 56, 80, 81) that plaintiff had no case as the motorman was not called upon to act; and the part we quote from the opinion is purely obiter. However, the court did not deem it material whether or not one may be negligent in "thinking" that he can extricate him-

self from a given situation. Even when that case was decided the humanitarian doctrine had been construed as not excusing the conduct of the motorman because plaintiff was negligent. No doubt the court was of the opinion that if plaintiff was negligent in thinking he could clear the track then he could not recover because it was not sufficient to show merely negligence on the part of the motorman but wantonness. [See l. c. 567.] Under the later cases a showing of negligence on the part of the motorman is sufficient. [Murphy v. Railroad, supra.]

We have examined the case of Barnard v. Met. St. Ry. Co., 137 Mo. App. 684, and like cases cited by the defendant and find them not in point. In the Barnard case there was no reason for the motorman to believe that the sliding of the wheels of the wagon along the street car track was not temporary and easily remedied (see l. c. 692) and the court held that, as a matter of law, plaintiff could have remedied the situation by pulling off the track had he been so disposed. The running of an automobile in a rut eight inches deep is not similar to a case of a wagon proceeding along a street car track under circumstances where it is easy for the driver of the wagon to pull off the track.

We think, however, that the court erred in giving plaintiff's instructions Nos. 1 and 2, which read as follows:

" 'P-1. The court instructs the jury that it was the duty of defendant's motorman in charge of the car mentioned in evidence, to exercise reasonable care to keep a watchout ahead for persons and vehicles on the track upon which the car in question was running. Therefore, if from the evidence you find:

" 'First—That on or about January 14, 1924, the automobile which plaintiff was driving and defendant's car collided at the place referred to in the evidence, that plaintiff was unaware of the dangerous proximity of said car until too late to escape said collision and that plaintiff was thereby injured, and—

" 'Second—That defendant's motorman, by the exercise of ordinary care, could have seen that plaintiff was in the way of said car or about to get in its way in time for said motorman thereafter, by the exercise of ordinary care to have stopped said car, or sufficiently reduced its speed, and that by so doing he could have averted such injury to plaintiff without injury to himself or others and that said motorman failed to exercise such ordinary care, that such failure, if any, directly caused or helped to cause said injury, then your verdict must be against the defendant and for the plaintiff regardless of whether plaintiff was or was not negligent.'

" 'P—2. You are instructed that if from the evidence you find the facts to be as stated in the paragraph of the foregoing instruction beginning with the word "first" and ending with the words "was

thereby injured," and further find from the evidence that defendant's motorman by the exercise of ordinary care, could have known before plaintiff got in the way of said car that he was about to do so, in time for said motorman thereafter by the exercise of ordinary care in the use of the means at his command, to have warned plaintiff of its dangerous proximity, and that plaintiff could and would have heard such warning, and thereafter could, and by reason thereof would, have escaped injury, and that said motorman failed to give such warning and that such failure directly caused or helped to cause said injuries, then your verdict must be for the plaintiff regardless of whether plaintiff was or was not negligent.' "

We think that in this case there is wholly absent any evidence that plaintiff was deceived as to the dangerous proximity of the street car as, in effect, was submitted in the instructions. Plaintiff testified that he gave no particular notice to the street car until he finally got his front wheel off of the track; that he did not even particularly notice his own speed after he dropped into the rut; that "at that time my attention was more centered on getting out of the rut than most anything else." He testified that even after he got his front wheel out of the rut, "I didn't see it (the car) all the time. No, I was more concerned with getting out of the rut."

"Q. You thought you was going to get out all the time is the reason you kept on? A. Just that is what I figured on—getting into clear.

"Q. The fact of the matter is when you got the front wheels out it never occurred to you that you would not get out? A. I thought that I would. The thought that I would not get out never came to me at all."

He did not at any time testify as to what he thought the speed of the street car was and there is no showing that he was deceived in any respect concerning its movement. While he testified that he was not looking at the street car all the time, his testimony is conflicting.

"Q. As a matter of fact, you were looking at it nearly all the time? A. You are looking ahead when you drive." Afterwards he testified:

"Q. As you were facing the way you were, the position you were in, and had been in all that time, if you looked straight ahead there was nothing in the way to keep you from seeing the car in front of you? A. There was nothing to obstruct my view between there and the street car. A man in driving will hold his head at different angles. Sometimes he will only see a few feet in front of him and other times more.

"Q. It is your practice to see several feet? A. Yes, and sometimes hundreds of feet and sometimes when you try to get your wheels out of a rut you look in front and not see a hundred feet.

"Q. You could not see the wheel. A. You can see it at times and you can feel—

"Q. (interrupting) I am not talking about feeling. You can't see it. A. You can tell by the sensation."

Of course, if plaintiff was looking ahead to any extent whatever while he was driving with both wheels in the rut, it could not have been that he did not see the car which was but a short distance away and directly in front of him. To rule otherwise would be holding against the physical facts. He knew there was a car upon the track and that it had been approaching. He did not testify that he did not think that it would not continue to approach and his conduct in making vigorous efforts to get his automobile out of the rut shows that he expected it to move forward. To say that he did not keep a watchful eye upon the street car would be so at variance with the common experience of mankind as to be wholly incredible and unworthy of belief. He may not have been looking at the car every instant but he was looking at it sufficiently to see what it was doing. Of course, under plaintiff's testimony, there could have been but a very short interval of time between the periods when he said that he was not looking up at the street car and we do not consider his testimony as a claim on his part that he was not keeping a watchful eye upon the movement of the street car. We construe him to mean that he was busying himself more with attempting to get out of the rut, thinking all the time that he would get out of it in an instant and therefore did not center his attention specially upon the street car so as to gauge accurately its speed or position. However, he does not claim that he was deceived in any manner whatever by its action and we think there is no room for saying that he was oblivious to his peril as far as the action of the street car was concerned. The "proximity" of the street car and plaintiff's knowledge of this, must be conceded and plaintiff showed every evidence of the fact that he knew its presence was dangerous and, as before stated, he did not claim at the trial that he was deceived in any way by its movement.

However, we would not declare plaintiff's instruction No. 1 erroneous because it submits that "plaintiff was unaware of the dangerous proximity of said car" if the other elements necessary to establish the humanitarian doctrine were submitted in the instruction, for although there was no evidence of lack of knowledge of the presence of the car, the instruction would not have been erroneous if it had merely submitted more than was necessary for plaintiff to prove. However, beginning with the word "second" in plaintiff's instruction No. 1, the humanitarian doctrine as applied to the facts in this case was not properly submitted. In the first place it reads that if the motorman saw or could have seen that plaintiff "was in the way of said car or about to get in its way, in time for said motorman . . . to

have stopped said car, or sufficiently reduced its speed," etc., plaintiff was entitled to recover. The instruction, as it reads, permits the jury to find that the motorman was negligent even though he saw or had every reason to believe that plaintiff would get out of the way of the car. It is claimed by plaintiff that the use of the words "in the way of said car" is the same as saying plaintiff was in a position of peril or danger. We do not think there is any merit in this contention, at least in view of the peculiar facts in this case. When one is in front of an on-coming train or street car, with knowledge of its presence and can easily move off the track, and there is nothing to indicate that he will not, he is "in the way of" the train or street car but not in peril. Plaintiff was in the way of the street car when he first skidded into the rut yet the court was not justified from the evidence in saying as a matter of law that he was in a position of danger at this time and the instruction in effect so declares. Of course, it was much more damaging to declare, in effect, that plaintiff was in a position of peril when he was "about to get in its (the street car) way." This was a very close case upon the facts, even taking them in their most favorable light to plaintiff, and the court should have been careful to instruct the jury properly. Plaintiff's instruction No. 1, in effect, assumes that plaintiff was in a position of peril although the motorman was 200 feet distant at the time plaintiff got into the rut and thought, as plaintiff did, that he was going to get out of the same even before he tried, and even though the jury found that the motorman had reason to believe that plaintiff would stop his automobile and get out of the same. While the motorman's version of the occurrence was entirely different from plaintiff's he did testify that he had no reason to believe that plaintiff was in danger until plaintiff was twenty feet away.

Instruction No. 2 is clearly erroneous because it allows the jury to find that plaintiff was unaware of the dangerous proximity of the car when, as before stated, there was no obliviousness on the part of plaintiff as far as the presence of the street car was concerned. Plaintiff not having been deceived in any way by the presence of the car, there was no occasion for a warning of the *presence of the car* unless the motorman did not intend to stop when he could or was going at such a rate of speed that he could not stop, either by reason of the speed itself or by reason of some mechanical defect in the equipment of the street car (and there was no evidence of any mechanical defect), of which action of the motorman plaintiff had not sufficient knowledge. In other words, plaintiff must have been deceived to some extent by the action of the street car before he could say that a warning of its presence would have been of any benefit to him. However, this was not the theory upon which the instruction is drawn.

"The alleged failure to warn by ringing bell, or sounding the gong drops out of the case, because the plaintiff says he saw the on-coming car, *although he could not tell its speed at the time*. The absence of warning cannot avail him, because he saw the car and knew that it was coming." [Gubernick v. United Rys. Co. of St. Louis, 217 S. W. 33, 34.] (Italics ours.)

We have examined the cases cited by plaintiff and find some degree of deception to plaintiff in all of them. [See Spindler v. Wells, 276 S. W. 387; Steigleder v. Lonsdale, 253 S. W. 487.] In any event the instruction was erroneous in assuming, in effect, that plaintiff was in a position of peril before plaintiff got in the way of the car. There were but two situations that the jury could have found to have existed in reference to the manner in which plaintiff got in the way of the car; one is based upon the theory that he slid into the rut (and he and no one else knew that he was going to slip into it until he actually was in it or an instant of time before he actually got into it), the other is based on defendants' theory that, as testified by the motorman, he got in front of the street car when the automobile was twenty feet away from the latter, and there is no evidence whatever that any warning at that time would have been of any benefit. To assume, in effect, that plaintiff was in a position of peril before he got "in the way of said car" was clearly erroneous.

It is claimed by plaintiff that defendants are estopped to contend that the court erred in giving his instructions Nos. 1 and 2 for the reason that defendants offered instructions D-5, D-6, D-13 and D-16 were the converse and counterparts of plaintiff's said instructions. We think there is no merit in this contention. Defendants' instruction D-5 told the jury that they could not consider plaintiff's injuries until they found whether or not there was any negligence on the part of defendants' agent, etc., "as defined to you by other instruction." Defendants' instruction D-6 was merely upon the burden of proof and told the jury, in effect, that the burden was upon plaintiff to prove by the preponderance of the testimony that defendants were "guilty of negligence as defined in these instructions." Defendants' offered instruction D-13, which was refused, sought to tell the jury that it was the duty of plaintiff before going upon the track to look and listen for cars running thereon, etc., and that if he failed to look and listen, and could have heard or seen the approaching car in time to have gotten off the track and avoid the collision, then plaintiff was guilty of negligence and the jury should find for the defendants unless the jury found—" . . . The motorman in charge of the car saw, or by the exercise of ordinary care could have seen that the plaintiff was in a position of peril, that is, that he was on the track or so near thereto as to be in danger of being struck by the car, and that he could not get off said track before the car reached him,

and that thereafter the motorman did not exercise ordinary care to stop the car.''

Defendants' offered and refused instruction D-16 does not submit elements going to make up a case entitling plaintiff to recover but sought to submit one single matter of defense, that is, that if the motorman stopped the street car as quickly as it could have been stopped under the circumstances after plaintiff got in a position of peril, then, regardless of all other facts and circumstances, their verdict should be for defendants. This is not a case where defendants in one of their instructions refer to some definition in another instruction and that definition was not contained in any of defendants' instructions, but was contained in plaintiff's instruction and was a wrong definition, such as was assumed in the case of Quinn v. Railroad, 193 S. W. 933, nor is it a case where defendants' negligence was submitted to the jury in plaintiff's instructions alone and defendants adopted plaintiff's manner of submission or referred in terms to an instruction or instructions of plaintiff. But from a reading of defendants' given and refused instructions it appears that defendants had their own theory of the case under the humanitarian rule and as to what constituted negligence on their part and that this theory was submitted or attempted to be submitted in their instructions, and it is not apparent that defendants intended to adopt plaintiff's instructions. [Fidelity & Casualty Co. of N. Y. v. K. C. Rys. Co., 207 Mo. App. 137.]

Nor were defendants' instructions counterparts or the exact reverse of plaintiff's instructions. Defendants' instruction D-13 is very liberal to plaintiff on the question of the humanitarian doctrine and may show a theory on the part of defendants curing some of the defects in plaintiff's instructions Nos. 1 and 2, but it does require the jury to find that the motorman must have seen plaintiff on or near the track at a time when the latter could not extricate himself by getting off of the track, in other words, under defendants' said instruction the motorman must have seen, or constructively seen, plaintiff's predicament and realized that he could not get off the track, which he was either on or getting on, before the street car struck him. Plaintiff's instructions do not submit any such theory but in effect instruct the jury that if plaintiff was ''in the way of said car or about to get in its way'' the motorman should have stopped or slackened the speed of the car regardless of whether the motorman saw plaintiff's predicament, that is, even before the motorman saw that he was not going to get off of the track. It is, therefore, apparent that defendants' instructions were not counterparts or the converse of plaintiff's instructions.

It is claimed that plaintiff's instructions Nos. 1 and 2 are cured by the court's instruction No. 16. It is well established that an instruc-

tion which covers the entire case and directs a verdict for plaintiff must submit every element necessary to entitle plaintiff to recover and cannot be cured by another instruction. [State ex rel. v. Ellison, 272 Mo. 571.] But plaintiff insists that the "worst that can be said is that they (plaintiff's instructions) might have been more definite, which is not fatal. Any uncertainty therein is cured by" the court's instruction No. 16. In support of this contention plaintiff cites the case of Sutter v. Met. St. Ry. Co., 208 S. W. 851, and like cases. Those cases are not in point. There is not mere indefiniteness in plaintiff's instructions; they were very definite as to what the motorman was required to do and, as before stated, positively misdirected the jury.

Defendants complain of the refusal of their following instruction:

"D-2. 'The court instructs the jury that there is no evidence that the failure, if any, to ring the bell or gong on the car in question was the proximate cause of the injury complained of, and on that issue, your finding will be for the defendants.' "

We think that this instruction was properly refused. While we believe plaintiff was not deceived by the presence of the street car, he was deceived as to his ability to clear the rut. It may be that he was negligent in relying on his ability to do so but if the motorman saw and realized his negligence in this respect, a warning gong might have caused plaintiff to realize his mistake and caused him to stop his car and alight from it. A gong from the motorman might have brought to the consciousness of plaintiff that the motorman believed that plaintiff was not going to clear the rut, resulting in a decision on the part of plaintiff to desist in proceeding forward. As was said in Steigleder v. Lonsdale, supra, plaintiff must have had "all the notice that the ringing of a bell or the sounding of a signal would have given him" to excuse a failure to give it. It would seem extremely unnatural for a motorman, under the circumstances of this case, to have proceeded forward without even sounding his gong.

The judgment is reversed and the cause remanded. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.